**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **ANTONIO MARTINEZ,** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **No. 2:19-cv-05606-MSG** |
| | : | |
| **THERESA DELBALSO, et al.,** | : | |
| **Respondents** | : | |

---

**CORRECTED ANSWER TO PETITION FOR**
**WRIT OF HABEAS CORPUS**

Petitioner Antonio Martinez is a Pennsylvania state prisoner serving a sentence of life imprisonment without the possibility of parole. Before this Court is his petition for a writ of habeas corpus, as authorized by the Court of Appeals for the Third Circuit. Based on the pleadings, the trial and post-conviction records, and the factual record set forth below, the Commonwealth concedes that Martinez, who has always asserted his innocence, is entitled to relief. His trial was infected by serious prosecutorial and police misconduct, resulting in his wrongful conviction for the murders of Luis and Hector Camacho. [1]

---

[1] First Assistant District Attorney Carolyn Temin participated personally and substantially as a judge in a related matter, the prosecution of Commonwealth witness Angel Fuentes. Although that participation does not give rise to an actual conflict of interest in this, First Assistant Temin has been screened from all participation in this matter in an abundance of caution.

In April 1990, then Court of Common Pleas Judge Theodore McKee, sitting without a jury, found Antonio Martinez guilty of first-degree murder, voluntary manslaughter, and possessing an instrument of crime in connection with the 1985 deaths of brothers Hector and Luis Camacho. At trial, only two witnesses linked Martinez to the crime, both of whom presented serious credibility problems.

The crux of Martinez's present claims centers around a cache of witness interview records and accompanying memoranda discovered in the District Attorney's Office's files ("DAO file") and the Philadelphia Police Department's homicide investigation file ("H-file"). These documents revealed that the police investigation into the crime for which Martinez was convicted was initially focused on at least two individuals, Wilson Santiago and an accomplice, and that several witnesses identified Santiago and/or his brother as the Camacho brothers' killer(s). Despite a clear obligation to provide this exculpatory evidence to Martinez prior to his trial, it was suppressed for decades and disclosed for the first time in late 2018.

In the instant petition, Martinez raises two main claims: (1) that the suppression of this evidence violated his right to due process[2] and (2) that the evidence of his innocence entitles him to habeas relief even absent any constitutional violation. For the reasons set forth below, the Commonwealth concedes that Martinez's right to due process was violated by the prosecution's suppression of this evidence. Moreover, given the weakness of the case against

[2] Martinez argues in the alternative that, if the evidence at issue in this petition *had* been disclosed, his trial counsel was ineffective for failing to utilize it in his defense. Because it is apparent (and the Commonwealth concedes) that the evidence was suppressed, this alternative claim need not be addressed.

Martinez, the Commonwealth agrees that "but for constitutional error, no reasonable factfinder would have found [Martinez] guilty of the underlying offense." 28. U.S.C. § 2244(b)(2)(B)(ii). Although Martinez was wrongfully convicted, the evidence of his innocence is insufficient to support relief on his freestanding claim of innocence, which should be denied.

Martinez's petition should be granted in part and denied in part; he is entitled to relief in the form of a new trial.

## I. FACTS AND PROCEDURAL HISTORY[3]

The police spent years investigating the murders of Hector and Luis Camacho. Because the investigation spanned several years with a significant period of dormancy in between, it is helpful to delineate evidence uncovered during the original investigation from evidence uncovered during the cold case investigation. During the original investigation, which was by far the most extensive, the police conducted, at least nineteen formal witness interviews. Many of those interviews bore fruit, which allowed the police to develop compelling evidence that the Camacho brothers were killed by Wilson Santiago and at least one other person as part of a drug deal gone awry. However, neither Santiago nor his named accomplice were ever arrested, charged or questioned. Instead, Santiago's brother-in-law,

---

[3] The Commonwealth concurs in and stipulates to the facts and procedural background set forth in Martinez's Memorandum of Law, which are accurate in all material respects and confirmed by the Commonwealth's independent review of the case. (ECF No. 1, *Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus* at 3-20). Citations to the Appendix included with Martinez's Petition and Memorandum of Law are styled as "App." followed by a reference to the page number. Citations to the Supplemental Appendix included with this Answer are styled as "Supp. App." Followed by a reference to the page number.

Antonio Martinez, who was never identified as a suspect in the original investigation, was charged as the sole perpetrator of the crime years later.

The police and prosecution withheld nearly all of the evidence collected during the original investigation of the murders from Martinez and his trial counsel. In fact, the Commonwealth only provided statements from *three* non-police witnesses in response to Martinez's discovery request. At trial, the Commonwealth presented only two witnesses to implicate Martinez—both of whom had serious credibility problems. The Commonwealth's trial theory was that Martinez acted alone when he shot and killed the Camacho brothers, almost as if the original investigation into the homicides had never occurred. Despite the plethora of evidence suggesting that the crimes were committed by at least two people (neither of whom were Martinez) and the credibility problems with the Commonwealth's trial witnesses, Martinez was convicted and imprisoned for life.

Decades later, in late 2018, the full story of the investigation into the Camacho brothers' murder was finally told for the first time.

**A. The Crime and Suppressed Investigation**

On February 19, 1985, brothers Luis and Hector Camacho were murdered in broad daylight near the corner of 4th and Dauphin Streets in Kensington. The police began to investigate immediately thereafter.

Among the first witnesses interviewed were Michael Massa (Supp. App. 1-6), and Adam Rodriguez (Supp. App. 7-8). Massa, who worked at a tire shop nearby, told police that a man had come into his store and asked to use the restroom; he was bleeding around his right calf and had a rip in his right pant leg. The man told Massa that a dog had attacked him. Rodriguez had been playing basketball at

4th Street and Susquehanna when he heard two gunshots. He ran to see what had happened and saw two men with guns, one standing near the door of the candy shop at 4th and Dauphin, and another kneeling next to a brown car, a two-door Duster. The man kneeling next to the car shot twice at the man near the store, and the man near the store fell. A Hispanic man then exited the brown car and ran through a lot. Rodriguez stated that he saw blood around the man who was kneeling next to the car.

The police also interviewed Herminos Fiegueroa, a friend of victim Hector Camacho. (Supp. App. 9-11). Fiegueroa reported that Hector had previously been imprisoned for killing a man in self-defense, and that the man's family may have killed Hector in retaliation.[4]

Within the next few days, it became apparent that the killing likely involved a drug deal gone wrong. On February 21, the police interviewed Brunilda Camacho, Hector's wife, who told them that she had heard on the street that Luis' brother-in-law, Saturino "Sambo" Ramos, had purchased a large amount of cocaine, which Luis Camacho then sold. (Supp. App. 12-15). The buyers argued with Luis and Saturino that the drugs were "bad." Luis and Ramos drove to 4th Street to meet with the buyers. After another argument erupted, Luis called his brother Hector, who drove to 4th Street. When Hector arrived, the shooting started.

The police interviewed Ramos on February 26. (App. 34-39). He told them Hector had asked that he and Luis Camacho meet him on 4th Street between

[4] Hector was convicted of voluntary manslaughter in July 1983. *Commonwealth v. Camacho*, CP-51-CR-0112521-1982 (Phila. Common Pl. Ct.).

Dauphin and Susquehanna. When they arrived, he saw Hector arguing with a man, he saw a gun and then he saw a struggle ensue between the two men. Ramos stated that he was across the street when he heard a gunshot. He turned and saw that the two men were still struggling, and that Luis was walking towards them. He started running away, but a dog bit him on his leg, knocking him down. As he fell, he hit his head—a bandage on the left side of his head, above his eye, was noted by police. Ramos stated that after he got up, he heard another gunshot. He ran through a lot to the tire shop, where he washed his face in the bathroom. Before taking off, he also flagged down an ambulance on 4th Street. Ramos stated that he did not know the man Hector was arguing with. The police questioned Ramos about Wilson Santiago, the owner of the store in front of which the Camacho brothers were murdered. Among other things, they asked whether there had been a dispute between the Camacho brothers and Santiago over drugs; Ramos told them there wasn't, and that Santiago hadn't shot the Camacho brothers.

A little over a week later, on March 5, the police received a tip from an anonymous Hispanic female, who reported that the "doer" was Wilson Santiago. (App. 40).

The police next interviewed Juana[5] Camacho, the victims' mother, on March 20. (App. 41-47). Juana Camacho reported that Saturino Ramos had recently called her to deny involvement in the brothers' murders. He told her that Wilson Santiago's brother shot Hector as the two men were arguing. Another shorter man shot Luis. The two men then ran away, as did Ramos. Ramos told Juana that the

[5] Incorrectly spelled "Wana" on the statement.

argument was about a stolen car, but Luis' wife, Maria Ramos, told her that it was about drugs that Wilson Santiago had given to Hector. Juana reported to the police that a friend told her that Wilson Santiago's brother's name was Miguel and that he and the other shooter were fleeing to the Pastillo area of Juana Diaz in Puerto Rico.

The next day, the police interviewed Maria Elizabeth Ramos. (App. 48-51). Maria Ramos, Luis Camacho's wife, stated that about three days after the shooting, she spoke to her brother, Saturino Ramos. He told her that he was hiring a lawyer because he was at the scene of the shooting. He explained that he had gone by the candy shop store, where Hector, who was outside, told him that he needed his brother Luis. Ramos then picked up Luis and returned to the store. When they arrived, Hector got "smart with his mouth" and was shot as he went to get something from the car. Luis was shot when he went to grab his brother. Ramos told her he started running when one of the men came after him with a gun—he did not know either of the two shooters. She heard from others that the shooters were members of Wilson Santiago's family or men who worked at his store.

Armed with this information, the police and DAO filed a Notice of Submission of Investigation in the Investigating Grand Jury in June 1985. (App. 552). A handwritten memorandum detailed the purpose of that investigation: to identify and prosecute the Camacho brothers' murderer or murderers, and to identify and prosecute members of the drug conspiracy in which they were involved. App. 80. The memo only lists Wilson Santiago and his brother Miguel as potential suspects. Many of the witnesses that had been interviewed to this point

were listed as potential witnesses.[6] The police also prepared a typewritten Grand Jury Presentation containing essentially the same information. (App. 55-57).

Several months later, in September 1985, investigators took a statement from Heriberto Ramirez. (App. 59-67). He was re-interviewed on October 10. (App. 68-70). Ramirez told the police that he lived a few houses away from where the Camacho brothers were killed. On the day of their murder, he saw them in an argument about drugs in front of Wilson Santiago's store. Wilson, his brother-in-law Freddy, Wilson's stepson and Wilson's wife were all there. Ramirez saw Hector struggling with one of the men in the group, who he knew as Ray. Ray had pulled a gun, and Hector was trying to take it away when Freddy, Wilson's brother-in-law, came up behind him and shot him in the head. Freddy then shot Luis in the head. Ramirez heard that Freddy had fled to Puerto Rico. Wilson had told Ramirez previously that he had brought his brother-in-law to the neighborhood two weeks before the shooting to "straighten out some people on the block." App. 69.

Around the same time as Ramirez's re-interview, the police interviewed Eliezer Mejias about the crime. (App. 71-75). Mejias told them that he had spoken to a woman that lived at 4th and Dauphin whom he considered his "second mother." She insinuated to him that Wilson Santiago was responsible for the deaths of the Camacho brothers. When they spoke again a week after the shooting, she told him that Santiago had left for Florida and returned with his van painted blue. She had

[6] Although the memo is undated, it is likely that it was drafted around the same time as the Investigating Grand Jury submission. As detailed below, a number of additional witnesses implicated Wilson Santiago in the crime in subsequent interviews, and it is unlikely that their accounts would have been omitted from the memo if the memo was prepared after those interviews.

heard the brothers were shot because they had crashed Santiago's Cadillac and had not paid for the damage. She also told Mejias that Luis was shot in the back and that Hector was shot after Luis.

The police re-interviewed Hector's wife, Brunilda Perez Camacho, a week after Mejias (App. 76-78). She told them that Luis Camacho had been dealing drugs and "did a bad deal" with Wilson Santiago. And that on the day of the shooting, Luis had called Hector at the house because he was "in a lot of trouble." Hector then left the house and was shot a short time later.

On October 17, 1985, detectives interviewed Miguel Angel Jimenez (Supp. App. 16-20): On the day of the shooting, Jimenez stated that he was outside in the neighborhood, cleaning a car. He went inside to use the bathroom, and his girlfriend's stepson told him that two men had been shot at Wilson Santiago's place. He asked "everyone" what happened, but no one knew. Jimenez stated that he had sold his store to Wilson Santiago and had heard that Santiago sells coke and heroin. He heard from people in the neighborhood that the shooting was related to drugs, likely cocaine.

On October 23, 1985, homicide investigators met with the Chief of the DAO's Homicide Unit who assigned another prosecutor to review the case for presentment to the Investigating Grand Jury. (App. 79). The prosecutors suggested to the homicide investigators that Wilson Santiago and his wife, Elsa, should be brought in for questioning and they should be told of the investigation and the possibility of an Investigating Grand Jury Subpoena. Although the investigators attempted to find the Santiagos at both their store and home, they were

unsuccessful. There is no record of the Santiagos or any other witnesses being called to testify before the Investigating Grand Jury.

In August of 1986, Radame Lopez was arrested for unrelated narcotics violations. While being interviewed for that offense, he offered to assist in the investigation of the Camacho brothers' murder in exchange for being released. (App. 83-87). Homicide detectives brought Lopez to the Homicide Division for questioning, and he informed them that he arrived at the scene of the Camacho brothers' shooting about 20 minutes after the incident. He heard that there had been an argument about cocaine, and that Hector had bought bad coke from either Wilson or Wilson's cousin, Tony.[7] Lopez heard that Tony was the man who pulled the trigger.

In October of 1986, a police informant brought a potential eyewitness, Maria Torres to the Homicide Division. (App. 88). Torres indicated that she was reluctant to speak with police because she feared for her and her child's lives, but ultimately told the police that she lived near Wilson Santiago's store and witnessed the Camacho brothers' murder from her second-floor window. From her vantage point, she observed Hector Camacho[8] enter Wilson Santiago's store. She heard a loud heated argument, followed by what sounded like gun shots from inside the store. Wilson then dragged Hector's body from the store to the sidewalk. She then

---

[7] The police apparently did not locate anyone who was a cousin of Wilson Santiago as part of their investigation, but years later during the cold case investigation, they identified one of his brothers-in-law, Antonio Martinez, who may have gone by the name "Tony."

[8] Although she did not know Hector Camacho's name, she identified his photograph as the man she saw. App. 88.

saw a car park next door, Luis Camacho get out and advance towards Santiago, saying that was his brother. As Luis approached, Wilson Santiago's brother, Manuel Santiago, shot Luis in the head. Torres also observed Saturino Ramos, who was with the Camacho brothers, and Wilson Santiago's stepson, Jose DeJesus, at the scene. The homicide detectives did not obtain a written statement during Torres' interview, so they made arrangements for her to return a few days later to do so. *Id.*; *see* App. 548-49 (partially completed 75-48 Investigation Interview Record form). It does not appear that ever occurred.

Despite the many witnesses implicating Wilson Santiago and an accomplice, no presentment was ever returned by the Investigating Grand Jury, and no arrests were made.

**B. The Cold Case 1989 Investigation**

The investigation into the Camacho brothers' murders appears to have gone cold for several years. In January or early February of 1989, David Fuentes reached out to Officer Miguel Deyne, with whom he had a long history as an informant. Fuentes told him that he had information regarding the Camacho brothers' murder. N.T. 5/2/1990 at 10-11 (App. 315-16). Officer Deyne referred him to Detectives Snell and Ainsley, who had recently been assigned to do a follow-up investigation into the killings. N.T. 5/1/1990 at 5 (App. 253).

On February 9, 1989, the detectives interviewed Fuentes. (Supp. App. 21-27). He told them that he was driving his pickup truck on 4th Street on the day the Camacho brothers were killed. He saw Luis and Hector speaking to a man named Tony and a fourth man; Tony had a pistol in his right hand. Fuentes heard three or four shots, then saw Hector and Luis fall to the ground. Fuentes had known Tony

for "around a year" prior to the shooting, and had heard Tony call Wilson Santiago "compadre."

Around a month after Fuentes gave his statement, and for reasons the police did not document, the detectives re-interviewed Heriberto Ramirez to "verify the information provided by David Fuentes." (Supp. App. 28). Ramirez, however, was unable to meet with them because he had to care for his quadriplegic wife and their children.

On March 15, 1989, the police interviewed Carlos Diaz, then-incarcerated at Holmesburg Prison for possession and sale of a controlled substance. (App. 94-98). Diaz told them that the Camacho brothers worked for Wilson Santiago delivering heroin. The brothers would "burn" Santiago by either cutting the dope or telling him that they were getting burned themselves. Diaz also told the police that Santiago ran the bar at 4th & Berks Streets. The Camacho brothers would visit the bar, take money from Santiago at gunpoint, and then buy drinks for everyone at the bar. He heard Santiago say that he was going to kill the Camacho brothers. Diaz told police that Santiago always carried a gun, and that he even saw Santiago shoot a man inside his bar. According to Diaz, Saturino Ramos was with the brothers nearly every day. A contemporaneous police activity sheet indicated that Wilson Santiago was a major drug dealer in the area and that, in his absence, the operation was run by his wife, Elsa. (App. 98).

On March 22, 1989, Detective Ainsley and Officer Deyne interviewed Jose DeJesus, Wilson Santiago's stepson. (App. 89-93). DeJesus told them that he was inside Wilson Santiago's store when Hector and Luis Camacho were shot outside.

He told the police that the Camacho brothers were killed by Wilson Santiago's brother-in-law, Tony. According to DeJesus, Luis and Hector Camacho would buy cocaine from Tony. On the day of the shooting, Tony and the Camacho brothers were involved in an argument over money; Tony was demanding payment, but Hector Camacho told him that he didn't have the money and that Tony would have to wait. After some back and forth, Tony killed the brothers. When presented with a photo array, DeJesus identified Antonio Martinez as Tony.

The following day, Detective Ainsley met with ADA Barbara Christie, who approved an arrest warrant for Antonio Martinez, charging him with two counts of murder. App. 525-26. Sometime later, a homicide binder[9] was prepared for the prosecution, which included statements from the following witnesses:

[9] Homicide binders are prepared specifically for transmittal to the prosecution and are meant to contain, among other things, all relevant witness interviews, police documents, and forensic reports, all of which typically form the basis of the Commonwealth's case.

W I T N E S S-I N D E X

| Name | Description | Page |
|---|---|---|
| CAMACHO, Brunilda | decedents wife | C-16 |
| CAMACHO, Wane | decedents mother | C-9 |
| CANTRES, | Informative witness (Indio) | C-12 |
| CRUZ, Hector | Informative witness | C-15 |
| DEJESUS, Jose | Eye Witness (Gibby) | C-3 |
| ELIAS, Sandra | Informative witness | C-17 |
| FIGUEROA, Heriminos | Informative witness | C-19 |
| FUENTES, Angel | Eye Witness | C-2 |
| JIMENEZ, Miguel | Informative witness | C-13 |
| LOPEZ, Radame | Informative witness | C-7 |
| MASSA, Michael | Informative witness | C-10 |
| MEJIAS, Elizer | Informative witness | C-20 |
| PEREZ, CArlos | Informative witness | C-14 |
| PEREZ, Juan | Informative witness | C-11 |
| RAMOS, Elizabeth | Informative witness | C-8 |
| RAMOS, Saturnino | Eye Witness (Sambo) | C-4 |
| RODRIGUEZ, Adam | Eye Witness | C-6 |
| RAMIREZ, Heriberto | Eye Witness | C-5 |
| ROMERO, Jose | Informative witness | C-18 |
| SOUTHERLAND, Joanne | Informative witness | C-22 |
| WILLIAMS, Wynola | Informative witness | C-21 |

P O L I C E-W I T N E S S

| Name | Description | Page |
|---|---|---|
| P/O SICKEL, Edward #9368 | 1st Off. on scene | C-24 |
| P/O STEPHAN, William #3293 | Stake Out | C-26 |
| P/O WESTRAY, James #2391 | Stake Out | C-27 |
| P/O WHEELER, John #3537 | Lst Off on scene | C-23 |
| P/O WILEY, Richard #3929 | Transported body | C-25 |

*Scanned image of witness index from homicide binder.*

Critically, the homicide binder did not include any information provided by Maria Torres, who told police she observed Wilson Santiago and his brother Manuel execute the Camacho brothers.

### C. The Trial

As a result of the cold case investigation, Martinez was arrested in March 1989 and charged with the Camacho brothers' murders. In May 1989, the

Commonwealth responded to the defense request for discovery, and provided the following non-police witness statements:

1a. Angel Fuentes, 2/9/89
1b. Angel Fuentes, 2/28/89
2. Heriberto Ramirez
3. Jose DeJesus

*Scanned image of May 1989 discovery letter, App. 32.*

Martinez, represented by John J. Scott, Esq., was tried before the Honorable Theodore McKee, and waived his right to a jury. The Commonwealth, represented by ADA Richard Sax,[10] did not call Ramirez or DeJesus to testify at trial, and instead relied on Fuentes and a new witness, Renaldo Velez, to identify Martinez as the Camacho brothers' killer. Velez was brought in as a witness "on the eve of trial, not prior to the preliminary hearing. Not during the course of the investigation, but on the eve of trial." N.T. 5/2/1990 at 128 (App. 433).

The Court of Common Pleas described the trial evidence as follows:

> At trial, the Commonwealth established that, on February 19, 1985, Hector Camacho was shot once in the head by a bullet which penetrated his brain, and that he also received a grazing gunshot wound to the head as well as gunshot wounds to the shoulder and arm. N.T. 4/25/90, pp. 29-30. His brother, Luis, was fatally shot once in the head in the same incident. *Id.*
>
> Although two witnesses identified [Mr. Martinez] as being the shooter, the main witness against the [Mr. Martinez] was Angel Fuentes. Fuentes testified that he was in his truck in the afternoon of February 19, 1985, and that he had stopped for a stop sign in the vicinity of 4th and Dauphin Streets when he saw [Mr. Martinez] shoot Hector, turn and shoot Luis, and then turn back to Hector and

[10] The Respondent's April 6, 2020 *Answer* incorrectly stated that ADA Sax was assigned in May 1989 and was personally responsible for preparing the response to the defense's request for discovery. However, upon further review of the DAO file, it appears ADA Sax was assigned the case shortly before trial, in April 1990.

> continue shooting as Hector lay on the ground. *Id.* p. 52. Fuentes testified that he did not see a weapon in the hand of either victim. *Id.* p. 54.
>
> Fuentes did not initially report this observation to the police. However, after the shooting, he was himself incarcerated on unrelated charges and decided to tell the police what he had observed as he felt "perhaps they will help me." *Id.* p. 60. He called Homicide Detective Miguel Deyne, whom he had known and given information to for many years, and subsequently identified [Mr. Martinez] from a police photo spread.
> . . .
>
> The Commonwealth also called Renaldo Velez who corroborated Fuentes' identification of [Mr. Martinez] as being the shooter, however, Velez had given conflicting accounts of the incident. His trial testimony conflicted with a statement he had given to police approximately one week before trial. At trial Velez testified that [Mr. Martinez] shot in apparent self-defense after the Camacho brother approached [Mr. Martinez] with guns. *See generally*, N.T. 5/2/90, pp. 39 et seq.

*Commonwealth v. Antonio Martinez*, CP-51-CR-0530631-1989 at *2-4 (Phila. Common Pl. Ct. April 12, 1993) (footnote omitted) (App. 3-5).

Prior to closing arguments, Judge McKee cautioned counsel for both parties not to focus on Fuentes' testimony:

> Let me mention, to the extent I can limit it, don't spend too much time hammering on Mr. Fuentes' testimony.
>
> There are a lot of problems with his testimony.
>
> However, to the extent there is corroboration, you can address those things. But, Fuentes, in himself is—well, you may proceed.

N.T. 5/2/1990 at 125 (App. 430). Despite his plain concerns regarding Fuentes' credibility, Judge McKee convicted Martinez of, among other things, first-degree

murder for the killing of Hector Camacho and voluntary manslaughter stemming from the killing of his brother, Luis.[11]

### D. Post-Verdict Motion and Sentencing

Following his conviction, Martinez requested appointment of new counsel to pursue a post-verdict motion. The motion focused on his inability to establish the extent of the benefits Fuentes expected to receive in return for his testimony due both to his trial counsel's ineffectiveness and the trial court's improper limitation of Fuentes' cross examination. As a result of these errors, Martinez was unable to develop a complete record of those benefits, including leniency for Fuentes' son who was facing murder charges of his own.

During post-hearing arguments, ADA Sax conceded that Fuentes' testimony was not sufficiently credible to support Martinez's conviction on its own:

> I don't think this court, as the fact finder, was impressed with Angel Fuentes. I think the record and perhaps the notes might bear that out, there probably would have been an acquittal if I did not call and find Mr. Ray Valez [*sic*] regarding identification, let alone the circumstances.

N.T. 7/18/1991 at 52 (App. 501); *see also id.* at 60 (App. 509) (noting that Martinez's arguments centered around "Fuentes' testimony, who you didn't believe anyway."). Accordingly, since Martinez's conviction must have rested on Velez's testimony, his inability to properly cross-examine Fuentes was harmless.

---

[11] The differing verdict may stem from Velez's testimony that the Camacho brothers fired upon Martinez before being killed. Martinez's counsel relied upon that account to argue that, if Velez was believed, the shootings were in self-defense, though Martinez himself always professed his innocence.

Judge McKee ultimately held that he had erred in cutting off cross-examination of Fuentes and that Martinez's counsel was ineffective but determined that the errors were harmless. N.T. 8/14/1991 at 2-3 (App. 514-515); *id.* at 515 (clarifying that the errors "[go] to Fuentes' testimony, which is already under a major cloud"). The court proceeded to sentence Martinez to an aggregate term of life without the possibility of parole. *Id.* at 9-10 (App. 521-22). Martinez, who did not testify at trial and has never made any incriminating statement, continued to profess his innocence at sentencing. *Id.* at 7 (App. 519).

Martinez's conviction was affirmed on direct appeal, and his subsequent state collateral attacks were denied as untimely. *See Martinez v. Delblaso*, E.D. Pa. Civ. No. 16-1157 *Report and Recommendations,* ECF No. 12 at 1-3 (Nov. 29, 2016) (describing procedural history) (hereafter "R&R").

**E. Martinez's Untimely First Habeas Petition & Rule 60(b) Motion**

After filing a number of untimely petitions under Pennsylvania's Post Conviction Relief Act, Martinez submitted a petition for a writ of habeas corpus in federal court in March of 2016. Martinez conceded that his petition was untimely but argued that the statute of limitations should be tolled in light of his difficulties with the English language and the lack of translation assistance in prison and because "suppression of evidence material to the defense warrants equitable tolling." *Martinez*, Petition ECF No. 1 at 14-15. Martinez further contended that he should be excused from the statute of limitations in light of his actual innocence. *Id.* at 15

The Court determined that Martinez did not provide sufficient documentation of his language difficulties to establish that they constituted an

extraordinary circumstance justifying equitable tolling and that he had not exercised reasonable diligence in preserving his rights in any event. R&R at 7-9, *approved and adopted by* Order, ECF No. 19 (Feb. 3, 2017). Moreover, because Martinez had "failed to offer a reliable showing of actual innocence," he could not satisfy the high burden required to be excused from the time-bar under *McQuiggin v. Perkins*, 569 U.S. 383 (2013). *Id.* at 10-11. The Court finally noted that Martinez "fail[ed] to explain what evidence was suppressed and how suppression of this unidentified evidence would warrant application of the equitable tolling doctrine." *Id.* at 11 n.3. Accordingly, the Court dismissed Martinez's petition as untimely without addressing the merits of any of his claims.

In November 2017, Martinez sought to revisit the dismissal of his petition via a Motion for Relief from Judgment Pursuant to Fed. R. Civ. P. 60(b). *Martinez*, ECF No. 24 ("Rule 60(b) Motion"). In essence, the motion argued that the Court erred in dismissing his petition as untimely because he was actually innocent of the crimes for which he was convicted. In June 2018, the matter was assigned to a new Assistant District Attorney, Banafsheh Amirzadeh, to prepare a response to the Rule 60(b) motion. During the course of researching and preparing the response, ADA Amirzadeh obtained the DAO file. Upon review, she found that the DAO file appeared to be incomplete and did not contain a copy of the homicide binder. However, ADA Amirzadeh found reports in the DAO file that detailed the police interviews with Saturino Ramos and Eliezer Mejias, which appeared to undercut the Commonwealth's already weak case against Martinez. The DAO file also

contained evidence suggesting that these police interviews were never disclosed to Martinez.

After her initial review of the DAO file, ADA Amirzadeh ordered the H-file from the police department. There, she discovered additional exculpatory evidence (including the statements of Ramos and Mejias), that was not included in the Commonwealth's discovery letter to defense trial counsel, as well as a copy of the homicide binder. After reviewing that evidence, it was apparent that the narrative presented at Martinez's trial was at best incomplete and that there was a strong possibility that he had been wrongfully convicted.

In August 2018, ADA Amirzadeh internally referred the matter to the Conviction Integrity Unit ("CIU") for further investigation.[12] The CIU conducted a

---

[12] While the Pennsylvania Rules of Professional Conduct are silent as to the obligations of a prosecutor who belatedly uncovers evidence of innocence, the Model Rules of Professional Conduct ("MRPC") promulgated by the American Bar Association provide a lodestar to guide prosecutors faced with this issue. Specifically, MRPC Rules 3.8(g) and (h) provide:

> (g) When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall:
>
> > (1) promptly disclose that evidence to an appropriate court or authority, and
> >
> > (2) if the conviction was obtained in the prosecutor's jurisdiction,
> >
> > (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and
> >
> > (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit.
>
> (h) When a prosecutor knows of clear and convincing evidence establishing that a defendant in the prosecutor's jurisdiction was

preliminary review of the material ADA Amirzadeh collected and accepted the case for additional investigation.

Meanwhile, the Commonwealth sought to stay the proceedings "for a reasonable amount of time, to permit the CIU to conclude its consideration of [Martinez's] case." *Martinez*, Motion to Stay Proceedings, ECF No. 36 at 2 (August 27, 2018). That request was denied, so the CIU prepared a response to the motion. In it, the CIU noted that the Rule 60(b) motion was without merit irrespective of the newly discovered evidence but noted that the Court may wish to appoint counsel for Martinez in the interests of justice. *Martinez*, Response to Petitioner's Motion for Relief from Judgment, ECF No. 42 (Dec. 13, 2018).[13] In addition to serving Martinez with its response, the CIU also forwarded copies of the evidence ADA Amirzadeh uncovered during her review. In sending these documents to Martinez, the CIU included cover letters in both English and Spanish explaining that the Commonwealth would not oppose a request for counsel. (App. 30-31).

Martinez filed a request for counsel in January 2019. Two months later, the Rule 60(b) motion was denied and Martinez' request for counsel was denied as moot. *Martinez*, ECF No. 45 (Mar. 18, 2019).

---

> convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction.

Although the Model Rules are not binding on attorneys in the Commonwealth of Pennsylvania, it is the expectation of the Philadelphia District Attorney that all prosecutors working on his behalf follow Model Rule 3.8(g) and (h) and seek to remedy wrongful convictions or, as here, refer any cases that potentially involve wrongful convictions to the CIU for further review and investigation.

[13] In accordance with MRPC 3.8(g)(1), copies of the newly disclosed evidence were also filed with the Court.

**F. The Instant Proceedings**

Martinez ultimately obtained *pro bono* counsel to represent him in a new federal challenge to his conviction based upon the new disclosures. *Pro bono* counsel requested that the CIU continue its investigation into Martinez's case. Then pursuant to a jointly executed Discovery and Cooperation Agreement, the CIU provided Martinez with open-file discovery, including digital copies of both the H-file and the DAO file in their entireties. Both the CIU and Martinez's counsel engaged in independent investigations of the case. Among other things, the CIU confirmed that there had indeed been an Investigating Grand Jury investigation initiated as part of the original investigation into the Camacho brothers' killings. However, because the records of those proceedings remained under seal, the CIU sought and obtained an order unsealing them so that they could be shared with Martinez's counsel.

After investigating and reviewing the material disclosed by the CIU, counsel for Martinez informed the CIU that he intended to file an application for leave to file a second or successive petition for a writ of habeas corpus. While the CIU's investigation into the matter was ongoing, it was apparent that the case involved serious constitutional violations and may well have resulted in the incarceration of an innocent person. Accordingly, the CIU informed Martinez that it would not assert and, wherever possible, would waive any procedural defenses that might bar consideration of any claims arising from the newly disclosed evidence. (App. 550).

On November 5, 2019, Martinez filed a motion under 28 U.S.C. § 2244 for authorization to file a successive habeas petition. The CIU filed a notice of non-

opposition to that motion on November 11, 2019, and the Court of Appeals granted the motion on November 21, 2019. *In re: Antonio Martinez*, C.A. No. 19-3575 (Nov. 21, 2019).

## II. JURISDICTION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits federal courts' jurisdiction over successive petitions for habeas relief. *See* 28 U.S.C. § 2244(b)(2). Relevant here, such petitions may only proceed where a petitioner shows: (1) that "the factual predicate for the claim[s] could not have been discovered previously through the exercise of due diligence," and (2) the facts underlying the claim . . . establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [them] guilty of the underlying offense." *Id.* at § 2244(b)(2)(B)(ii). The Commonwealth respectfully submits that Martinez satisfies both of § 2244(b)(2)(B)(ii)'s jurisdictional requirements. While the Third Circuit has determined that he established a *prima facie* showing that his petition satisfied this standard, this Court must make an independent determination regarding its jurisdiction over Martinez's petition.

Martinez plainly satisfies the first requirement—he had no means to obtain the suppressed evidence in this case prior to the December 2018 disclosure, as it was at all prior times in the exclusive control of the Commonwealth. No amount of diligence would have enabled him to obtain documents the Commonwealth illegally suppressed.

Martinez likewise satisfies the second requirement. The Third Circuit has held that this requirement is satisfied where a petitioner demonstrates "actual innocence" under *Schlup v. Delo*, 513 U.S. 298 (1995). *Munchinski v. Wilson*, 694

F.3d 308, 337 (3d Cir. 2012). To do so requires a showing of innocence that undermines confidence in the outcome of the trial, *Schlup*, 513 U.S. at 316, not "absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, 547 U.S. 518, 537 (2006). In short, the petitioner must demonstrate that "more likely than not any reasonable juror would have reasonable doubt." *Id.* at 538. This standard is exacting, but it is not insurmountable. It can be satisfied even without "a case of conclusive exoneration," where "[s]ome aspects of the State's evidence . . . still support an inference of guilt." *Id.* at 552, 553-54.

In this case, as discussed more fully in Section IV(A), *infra*, no reasonable juror presented with the undisclosed evidence in this case could find Martinez guilty of the crimes for which he was convicted beyond a reasonable doubt. This is especially so given the relative weakness of the Commonwealth's case, which relied on two dubious eyewitnesses who never came forward until years after the murders—one who received exceptional leniency for his own criminal misbehavior and who the trial court (and later the trial prosecutor) found to be incredible, and another whose "testimony conflicted with a statement he had given to police approximately one week before trial." *Martinez*, CP-51-CR-0530631-1989 at *4 (App. 5). By contrast, the new evidence includes numerous more contemporaneous accounts of the crime that identify others as the perpetrator. "When all of the evidence is considered as a whole, . . . no reasonable juror could rationally vote to convict." *See Munchinski*, 694 F.3d at 337; *id.* (concluding that petitioner made a gateway showing of actual innocence where the prosecution's case "was always close"). Martinez therefore satisfies § 2244(b)(2)(B)(ii)'s requirements.

## III. PROCEDURAL POSTURE

This petition for a writ of habeas corpus, Martinez's second, is filed decades after his judgment became final and presents claims that were never ruled upon by the state courts. Under normal circumstances, this would likely mean that Martinez could not obtain relief. But these are not normal circumstances. Martinez's trial was infected by serious misconduct and was fundamentally unfair, and the Commonwealth cannot ignore serious doubts regarding his guilt. Accordingly, the Commonwealth will affirmatively waive them. *See* Laurie L. Levenson, *The Problem with Cynical Prosecutor's Syndrome: Rethinking A Prosecutor's Role in Post-Conviction Cases*, 20 Berkeley J. Crim. L. 335, 378-79 (2015) ("Before slavishly invoking procedural hurdles, prosecutors should consider the substance of the claim. While the court must abide by procedural rules, there is flexibility in those rules if a prosecutor is truly concerned that there has been a wrongful conviction."). The merits of Martinez's claims are properly before this Court.

### A. Martinez's Claims Are Timely but Unexhausted

The Commonwealth concedes that Martinez's claims are timely. The evidence upon which they are based was first disclosed to Martinez in December 2018. Because this evidence was in the sole possession of the Commonwealth, Martinez had no means to discover it prior to that disclosure. He initiated these proceedings with an application for leave to file a second or successive habeas petition with the Court of Appeals for the Third Circuit in November 2019. Thus, his claims were timely filed within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

Although he raised these claims in a timely fashion, the state courts have yet to have a meaningful opportunity to pass upon and correct the violations of federal constitutional rights he alleges in this petition. *Duncan v. Henry*, 513 U.S. 364, 365 (1995), *citing Picard v. Connor*, 404 U.S. 270, 275 (1971); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition"). Accordingly, his claims are unexhausted.

**B. The Commonwealth Waives All Procedural Defenses, Including but Not Limited to, Exhaustion**

A lack of exhaustion does not deprive a federal court of jurisdiction over a claim; rather, it is an affirmative defense for a State to raise, and consequently, one that it can waive. *Sharrieff v. Cathel*, 574 F.3d 225 (3d Cir. 2009) (requirement that claims be exhausted in state court subject to waiver).[14] In light of the State's ability to waive this defense, it is incumbent upon prosecutors to seriously consider whether and to what extent the reliance on a procedural bar advances justice. Certainly, the principles of federalism and comity that animate the exhaustion requirement are important considerations in that analysis.[15] But they are not the

[14] "A court is not at liberty . . . to bypass, override, or excuse a State's deliberate waiver" of affirmative defenses. *Wood v. Milyard*, 566 U.S. 463, 466 (2012) (reversing rejection of a claim as untimely where the state knowingly and intentionally waived the defense).

[15] The exhaustion requirement both "expresses mutual respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions," and "properly acknowledges that state courts, no less than federal courts, are bound to safeguard the constitutional rights of state criminal defendants." *Landano v. Rafferty*, 897 F.2d 661, 668 (3d Cir. 1990); *see also Rose v. Lundy*, 455 U.S. 509, 518 (1982) (exhaustion doctrine protects state courts' role in enforcement of federal law and prevents disruption of state judicial proceedings); *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000) (same).

only considerations. *See* Explanatory Comment 1, Pa. R. Prof. Conduct 3.8 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."). Where, as here, a review of a challenged judgment discloses serious constitutional violations and a strong likelihood of actual innocence, the prosecutors are "obligat[ed] to see that the defendant is accorded procedural justice[.]" *Id.*

As discussed below, the Commonwealth agrees that Martinez's rights have been violated and lacks confidence in his judgment; there is a strong likelihood that, but for the constitutional violations in this case he would have been acquitted. Moreover, it appears that this Court is better equipped to address his claims in an expedient fashion. First, Martinez has the benefit of *pro bono* representation in this matter, but he is uncounseled in his state court petition and has no right to the appointment of counsel in those proceedings. Second, his state petition has been assigned to a judge who is unacquainted with the record in this case, while this Court has the benefit of familiarity as it recently reviewed Martinez's first habeas petition. Given these circumstances, proceeding in federal court is appropriate.[16]

In order to facilitate a timely review (and correction) of the constitutional errors in this case, the Commonwealth will not assert and affirmatively waives any and all non-jurisdictional procedural bars that would otherwise prevent this Court from considering the merits of Martinez's claims or issuing appropriate relief.

---

[16] The Commonwealth also notes that, given the current COVID-19 pandemic, the state courts have essentially closed. *See In re: General Statewide Judicial Emergency*, Nos. 531 & 532 Judicial Administration Docket (Mar. 18, 2020). It is unknown when they will resume normal operations.

### C. Martinez's Claims Must Be Reviewed *De Novo*, but Any State Court Findings of Fact Must Be Presumed Correct

Under AEDPA, federal courts must defer to state courts' legal determinations and findings of fact. Here, Martinez's claims have not been addressed by the state courts, and the demanding standards of 28 U.S.C. § 2254(d) are therefore inapplicable. Accordingly, Martinez's claims should be reviewed *de novo*. *See, e.g.*, *Cone v. Bell*, 556 U.S. 449, 472 (2009) (*de novo* review where state courts did not reach merits of claim); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (*de novo* review where state courts did not reach prejudice prong under *Strickland v. Washington*, 466 U.S. 668 (1984)).

While Martinez's claims must be reviewed *de novo*, this Court must presume that all state court findings of fact are correct absent clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This includes, of course, the credibility determinations made by Judge McKee sitting as factfinder. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

## IV. ARGUMENT

### A. Martinez Is Entitled to Relief on His *Brady* Claim

The evidence provided to Martinez prior to his trial—including statements from only three non-police witnesses—was merely the tip of an otherwise unknown exculpatory iceberg. But for its suppression, he would not have been convicted. Relief is warranted.

The prosecution has an obligation to disclose to the defense information that is favorable to the guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963). This obligation requires that the prosecution disclose information that is exculpatory as well as impeaching. *Smith v. Cain*, 565 U.S. 73 (2012). It also extends to evidence that could be used to "attack . . . the thoroughness and even the good faith of the investigation" and to information possessed by law enforcement in the same jurisdiction as the prosecutors. *Kyles v. Whitley*, 514 U.S. 419, 438, 445 (1995).[17]

A new trial is required where the evidence the Commonwealth failed to disclose is material, *i.e.*, when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Cone v. Bell*, 556 U.S. 449, 470 (2009). A reasonable probability does not mean the

---

[17] The Commonwealth notes that the investigation and trial in this case predated the Supreme Court's decision in *Kyles*. Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310 (1989). The *Teague* bar against retroactive application of new rules of procedure does not imply that earlier proceedings were constitutionally sound. Rather, *Teague* is a nod to comity and finality, and serves as a limit on relief in federal habeas proceedings. As with similar procedural bars, these concerns must give way where, as here, a petitioner has made a convincing showing of innocence under the *Schlup* standard. To the extent the application of *Kyles* to the police conduct at issue in this case may be considered "retroactive," *Teague* must not prevent relief. For the reasons discussed above, the Commonwealth affirmatively waives all procedural defenses in this case, including the *Teague* retroactivity defense. *Danforth v. Minnesota*, 552 U.S. 264, 289 (2008) (noting that "States can waive a Teague defense, during the course of litigation, by expressly choosing not to rely on it . . ."); *see also, e.g.*, *Wilmer v. Johnson*, 30 F.3d 451, 455 (3d Cir. 1994) (holding *Teague* defense waived). In any event, it appears that most of the newly-disclosed evidence was in the possession of the prosecution, with the notable exception of the Maria Torres account. Accordingly, even if *Kyles*' requirement that exculpatory material in the possession of the police did not apply in this case, Martinez would still be entitled to relief.

defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Kyles*, 514 U.S. at 434. Under this standard, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. Accordingly, a "reasonable probability" of a different result is "shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted). The materiality of suppressed evidence must be "considered collectively, not item by item." *Id.* at 436; *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 312 (3d Cir. 2016) (*en banc*).

The Commonwealth agrees with Martinez that there was a significant amount of material evidence suppressed, in violation of *Brady* and *Kyles*. The CIU reached this conclusion based on the existence of several facts. First and most obviously, the Commonwealth's response to Martinez's pre-trial discovery request omitted all of the witness interviews and activity sheets that indicated Wilson Santiago was responsible for the killing. Second, a review of the trial record and post-verdict proceedings indicates that Martinez's counsel was unaware of these statements because if he was aware, he most likely would have brought the existence of another suspect to the attention of the trial court; on the other hand, if trial counsel had been apprised of Santiago's existence and just failed to utilize the evidence in some manner at trial, post-verdict counsel would have included that failure in his complaints of ineffective assistance of counsel. *See, e.g.*, N.T.

5/2/1990 at 63-69 (App. 368-74) (cross-examining Velez regarding accusations that he was involved in the murder); N.T. 7/18/1991 at 61 (App. 510) (noting that but for Fuentes' testimony against Mr. Martinez, Velez was the "prime suspect"). Trial and post-verdict counsels' failure to address Santiago as an alternate suspect is most easily explained by the complete lack of disclosure of that information.[18] Finally, the existence of the apparently fruitless Investigating Grand Jury investigation which focused on Wilson Santiago plainly should have been disclosed to Martinez. *Kyles*, 514 U.S. at 445 (granting relief where suppressed evidence "would have raised opportunities to attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well."). But even the fact that the case was submitted to the Investigating Grand Jury remained under seal until the CIU's motion.

As Martinez aptly and correctly argues, *Memorandum of Law* at 26-28, the suppressed evidence encompasses nearly all of the police investigation into the Camacho brothers' murders prior to the 1989 cold case investigation. Rather than disclose the welter of witness statements gathered in the aftermath of the crime, most of which implicated at least two people other than Martinez, the police and

---

[18] Notably, Officer Deyne, who initially brought Fuentes to the homicide detectives' attention in 1989, was one of Maria Torres' interviewers. Based on trial counsel's questioning of Velez, trial counsel almost certainly would have sought to question Officer Deyne about Torres' statement that she saw Santiago kill the Camacho brothers when Officer Deyne testified at trial.

prosecution withheld all evidence implicating Wilson Santiago and his brother Manuel in the crime.[19]

If that material had been disclosed, Martinez could have (1) rebutted the testimony of Fuentes and Velez, who did not come forward until years after the crime, (2) raised significant doubt regarding the thoroughness of the investigation given the apparent abandonment of the Santiagos as suspects, and (3) provided the trial court with a compelling alternate theory of the case. It is difficult to imagine a more clear-cut or egregious violation of a defendant's right to due process. Relief is warranted.

### B. Martinez's Showing of Innocence Is Insufficient to Warrant Relief Absent Constitutional Error

In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court assumed, without deciding, that the execution of an innocent person would violate the Constitution and noted that the threshold to establish such innocence would be "extraordinarily high," and that the showing would have to be "truly persuasive." *Id.* at 417; *accord id.* at 426 (O'Connor, J., concurring).[20] Here, the evidence of

---

[19] Homicide prosecutors like ADA Sax were trained to review the police homicide file and homicide binder and ask questions. There is no question, ADA Sax was aware of the compelling evidence regarding alternate suspects whose names and identities were known, and he still did not disclose that information to the defense. Unfortunately, this is not the first case the CIU has encountered where ADA Sax failed to disclose compelling evidence of a specifically named and identified alternate suspect to the defense. In fact, in May of 2018, a separate homicide case against Dontia Patterson was *nolle prossed* under similar circumstances after the conviction had been vacated. As was noted in that case, *Brady* violations often occur in weak cases. And, as in this case, the case against Patterson was weak, and it is likely that without concealment of exculpatory evidence, the prosecution could not win.

[20] The Court found it unnecessary to be more specific, because Herrera's showing was unconvincing under any standard. *See id.* at 417–19; *accord id.* at 424–27

Martinez's innocence is insufficient to meet the "extraordinarily high" threshold necessary to obtain relief on a freestanding innocence claim.

While a defendant with a conclusive showing of innocence could prevail on a claim of innocence absent any other constitutional violation, "the required showing would have to be at least as high as the more demanding standard articulated by Justice Blackmun in his *Herrera* dissent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (*en banc*). As Justice Blackmun explained,

> [C]onviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

*Herrera*, 506 U.S. at 443 (Blackmun, J., dissenting); *accord id.* at 399–400 & 407 n.6 (majority opinion) (noting that a valid conviction strips petitioner of the presumption of innocence and attaches a presumption of guilt). Accordingly, "[i]n light of the presumption of guilt that attaches after a constitutionally valid conviction, 'it is fair to place on [a petitioner asserting a *Herrera* claim] the burden of proving his innocence, not just raising doubt about his guilt.'" *Carriger*, 132 at

(O'Connor, J., concurring). In the decades since, the Supreme Court still has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkin*, 569 U.S. 383, 392 (2013); *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 183 (3d Cir. 2017).

476–77 (quoting *Herrera*, 506 U.S. at 443 (Blackmun, J., dissenting) (alterations in original)).

In *House v. Bell*, the Supreme Court confronted a persuasive innocence claim and revisited the distinction between gateway and freestanding innocence claims. Among other things, House presented compelling evidence that his victim's husband was responsible for her death, including DNA evidence and testimony from two witnesses to whom he had apparently confessed. House also presented evidence that the blood spatter evidence relied upon to convict him was likely from vials of the defendants' blood that had spilled on other evidence. *House*, 547 U.S. at 540–53. Despite all this, the Supreme Court concluded that House's freestanding innocence claim was insufficient to warrant relief. *Id.* at 555. However, that "House [did] cast considerable doubt on his guilt—doubt sufficient to satisfy *Schlup*'s gateway standard for obtaining federal review despite a state procedural default." *Id.*

Here, the unconstitutionally suppressed evidence of alternate suspects, combined with the weakness of the Commonwealth's case against Martinez, provides ample basis to doubt Martinez's guilt. Martinez has also proffered numerous statements indicating that he was in Puerto Rico at the time of the Camacho brothers' murders.[21] But, while their credibility was dubious, some

[21] The CIU has yet to verify these documents or interview these potential alibi witnesses, as its investigation into Martinez' claim of actual innocence is ongoing. The COVID-19 pandemic has rendered it all but impossible to continue that aspect of the CIU's investigation while complying with applicable stay-at-home orders. However, the current state of the law regarding a freestanding innocence claim combined with Martinez's age (72) and increased susceptibility to the virus augers in favor of moving ahead with Martinez's request for relief and completing the

witnesses did implicate Martinez in the crime, and several others indicated that the shooter was Wilson Santiago's brother-in-law, though they believed his name was "Freddy." Accordingly, while there is ample reason to doubt his guilt, there remain questions as to his innocence. Thus, Martinez can satisfy the *doubt* centered gateway innocence standard and is therefore entitled to relief based upon the egregious violations of his right to due process detailed above. But the evidence of his innocence is not *conclusive* and therefore cannot justify relief standing alone.

## V. CONCLUSION

Martinez was convicted of two homicides based upon identifications made by two witnesses who came forward years after the shootings and whose testimony was received skeptically by the trial court. Unbeknownst to Martinez or the court that convicted him, the lengthy investigation into the homicides was initially focused on another man and his accomplice, and numerous witnesses provided statements that directly conflicted with the accounts provided by the prosecution's trial witnesses. If that information had been disclosed to Martinez as required by the United States Constitution, he would have been acquitted. Because his

actual innocence investigation in the event habeas relief is granted in order to determine whether the Commonwealth will legally have sufficient evidence to retry Martinez and ethically whether the Commonwealth should retry him.

incarceration stems from an unconstitutional and unethical prosecution, it must come to an end.

The Court should grant a conditional writ of habeas corpus and order that Martinez be retried within a reasonable time or released from custody.

Respectfully submitted,

LAWRENCE KRASNER
District Attorney of Philadelphia

*/s/Thomas Gaeta*
THOMAS GAETA
Assistant District Attorney

*/s/Patricia Cummings*
PATRICIA CUMMINGS
Supervisor, Assistant District Attorney
Conviction Integrity Unit
District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
215-686-9948

Date: October 22, 2020