# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTONIO MARTINEZ, | : | CIVIL ACTION NO. 19-5606 |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | |
| | : | |
| THERESA DELBALSO, et al., | : | |
| | : | |
| | : | |
| Respondents. | : | |

## EXPERT DECLARATION OF STEPHEN GILLERS

### I.  Background

1.     I am Elihu Root Professor of Law at New York University School of Law, where I have been teaching a course entitled Regulation of Lawyers and Professional Responsibility ("legal ethics") since 1978. My casebook, *Regulation of Lawyers: Problems of Law and Ethics*, first published in 1985, is now in its 12th edition (Wolters Kluwer, Nov. 2020).

2.     I have lectured on legal ethics in various forums nationally and internationally and have been active in American Bar Association ("ABA") committees and commissions in the field. I have testified by report, deposition, or in court in many cases throughout the United States. I have published many articles in law journals and elsewhere in the area of legal ethics.

3.     In the last four years, I testified live as an expert for the court-appointed special master Hon. Gerald Rosen (Ret.) in *Arkansas Teacher Retirement System v. State Street Corp.*, 404 F. Supp. 3d 486 (D. Mass. 2018)

and 2020 WL 949885 (D. Mass. 2020), and by deposition in *Curtis James Jackson, III v. Reed Smith LLP*, No. 15-21233 (AMM) (D. Conn.).

4.     My full resume is attached as Exhibit A.

5.     I rely on the facts in the Court's December 1, 2020 Order ("Order") and a chronology from counsel (attached as Exhibit B). I also rely on a transcript of the November 4 teleconference among the Court, Jonathan H. Feinberg, Patricia Cummings, and Thomas Gaeta.

6.     I cite to the Pennsylvania Rules of Professional Conduct ("the Rules"), but all rule references are substantively identical in the ABA's Model Rules of Professional Conduct.

7.     I am not being compensated for my work in connection with this matter.

## II.     Opinions

### A.  Rule of Professional Conduct 3.3

8.     There is a long history to Rule 3.3 of the Rules. For purposes of the Court's question, Rule 3.3(a)(1) provides, under the title "Candor Toward the Tribunal," as follows:

> A lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.

9.     It is the text of Rule 3.3 that describes what candor to the tribunal actually requires under the Rules. This is, of course, important because the word "candor" by itself provides little notice. The rule applies when a statement is a material one of fact or law and the lawyer knows or comes to know that it is false.

2

10.     The Rules describe different states of mind for what they require, forbid, or allow. Some rules contain no *mens rea* requirement. *See, e.g.*, Rule 1.7 ("Conflict of Interest: Current Clients"). Some rules speak of what a lawyer knows or reasonably should know. *See, e.g.*, Rule 4.4(b) ("Respect for Rights of Third Persons"). Yet other rules, like Rule 3.3(a)(1), require knowledge. Rule 1.0(f) defines "knows" and variants as follows:

> "Knowingly," "Known," or "Knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.

11.     Accordingly, Rule 3.3(a)(1) asks whether a lawyer knew that a statement of fact or law was false when made or came later to know that it was false.

12.     At paragraphs 3 and 4 of its Order, the Court identifies the context and the content of four statements made to the Court on April 6, 2020, by the District Attorney's Office, regarding the parallel state court proceeding.

> 3. On November 27, 2019, while that PCRA petition was still pending in state court, Martinez, with the assistance of current counsel, initiated the proceeding before me in federal court by filing a petition for writ of habeas corpus. In that petition, Martinez asserted that, prior to the 1990 trial, the Philadelphia District Attorney's Office ("District Attorney"), through the assigned Assistant District Attorney ("Trial ADA"), had suppressed information favorable to his defense as prohibited by *Brady v. Maryland*, 373 U.S. 83 (1963), thus requiring that his convictions be vacated.
>
> 4. In its response, on April 6, 2020, the District Attorney agreed that significant *Brady* violations had occurred. The District Attorney also acknowledged that Martinez had filed a state court post-conviction relief petition that was currently pending. Although Martinez had not fully exhausted his claims in state court, the District Attorney, apparently aware of the well-settled precedent requiring that all state court matters be fully resolved before a federal habeas claim may proceed, affirmatively advised me that the

3

District Attorney was waiving all procedural and exhaustion defenses. The District Attorney identified the following reasons in support of this unusual waiver: (1) "it appears that this Court is better equipped to address [Martinez's] claims in an expedient fashion"; (2) "Martinez has the benefit of pro bono representation in this matter, but he is uncounseled in his state court petition and has no right to the appointment of counsel in those proceedings"; (3) "his state petition has been assigned to a judge who is unacquainted with the record in this case, while this Court has the benefit of familiarity as it recently reviewed Martinez's first habeas petition"; and (4) "given the current COVID-19 pandemic, the state courts have essentially closed . . . [and] it is unknown when they will resume operations." (Resp. to Pet. at 26–27.) The District Attorney stated that "[i]n order to facilitate a timely review (and correction) of the constitutional errors in this case, the Commonwealth will not assert and affirmatively waives any and all non-jurisdictional procedural bars that would otherwise prevent this Court from considering the merits of Martinez's claims or issuing appropriate relief." (*Id.* at 27.)

13.    At paragraph 15 of the Order, the Court states: "Only *after* the significant attention that I gave this matter was set to culminate in an evidentiary hearing, at which the Trial ADA was scheduled to testify about the alleged suppression of exculpatory evidence and explain what he had referred to as misstatements made by the District Attorney, was I informed, for the first time, that the myriad reasons for the District Attorney's waiver of exhaustion were no longer applicable." That paragraph then addresses four statements made in the District Attorney's April 6, 2020, Answer to Mr. Martinez's petition for habeas corpus.

14.    The Court implies through citations to Rule 3.3(a)(1) and case law that, between October 14, 2020, and October 23, 2020, counsel from the District Attorney's Office and counsel for petitioner (collectively "counsel") came to have actual knowledge that one or more of these four statements were false, and that counsel were therefore obligated to so inform the Court. On October 14, 2020,

4

petitioner's counsel appeared for the petitioner in state court, and on October 23, 2020, the state judge vacated petitioner's conviction and sentence, as this Court was informed the same day.

15.     Rule 3.3(a)(1) did not require that counsel correct the four statements in this ten-day period for the following reasons.

16.     Prior to October 23, 2020, counsel could not know if and how the state judge would rule. They had reason to anticipate that Mr. Martinez would not secure relief on his PCRA petition on October 23. The petition had been pending since March 26, 2019, Ex. B at ¶ 8, without a hearing or any court action indicating any resolution of the matter on the merits. On July 2, 2020, the state judge who was newly assigned to the case "issued a *sua sponte* notice of intent to dismiss Martinez's PCRA petition as untimely." Ex. B at ¶ 34.

17.     When on October 8 counsel learned that the newly assigned state judge had scheduled a status conference for October 23, they prepared for it, as was not only appropriate, but required by their duty of competence. Ex. B at ¶¶ 40-43. While the state proceeding *might* have afforded relief—which was true from the time the PCRA petition was filed—in an October 15 telephone conference the state court judge informed counsel only "that she would endeavor to review [supplemental] pleadings before the status conference and inform the parties at that conference how the court would proceed." Ex. B at ¶ 42.

18.     In this context, I address each of the April 6 statements that are the focus of the Order.

(1)     *"[I]t appears that this Court is better equipped to address [Martinez's] claims in an expedient fashion."* This was counsel's

5

opinion and not a statement of fact. Nothing in the record suggests that counsel changed their opinion of which court appeared better equipped prior to October 23. Counsel did not know whether the state court would take up the merits of Martinez's petition. That court had merely listed the matter for "status."

(2)   *"Martinez has the benefit of pro bono representation in this matter, but he is uncounseled in his state court petition and has no right to the appointment of counsel in those proceedings."* Mr. Feinberg became private counsel on October 14, 2020, when he appeared for petitioner in the state proceedings, acting *pro bono* as he is in this matter. I address this statement below. *See infra* ¶ 19.

(3)   *"[H]is state petition has been assigned to a judge who is unacquainted with the record in this case, while this Court has the benefit of familiarity as it recently reviewed Martinez's first habeas petition."* There is no suggestion in the record that counsel did not believe this statement to be true when made or that the statement was not true. The state petition was assigned to a new judge in early 2020 and counsel learned about the reassignment in July after the state court issued its notice of intent to dismiss. Ex. B at ¶ 34. Until the October 23 state court conference, counsel could not have *known* (i) the degree to which the reassigned judge had become acquainted with the record or (ii) the comparative record familiarity as between the state judge and this Court.

(4)    *"[G]iven the current COVID-19 pandemic, the state courts have essentially closed . . . [and] [i]t is unknown when they will resume operations."* Rule 3.3(a)(1) did not require correction of this statement. The state court's scheduling of a status conference, when learned by counsel on October 8, does not contradict counsel's observation that "the state courts have essentially closed" such that counsel then *knew* that the quoted statement was false. One judge's act of scheduling a status conference does not make the statement false to counsel's knowledge.

19.    "The Rules of Professional Conduct are rules of reason." Scope at ¶ [14]. Rule 3.3(a)(1)'s duty to correct a statement has no specific time requirement. On October 14, 2020, petitioner's federal counsel appeared for petitioner in state court. Counsel acted reasonably in waiting ten days to so inform this Court. Of course, counsel could have done so the day of the appearance or the next day, and I appreciate that it would have been courteous to do so. But it was not a violation of Rule 3.3(a)(1) to wait. Nor is this a situation where waiting was intended to provide a strategic advantage, negating any inference that counsel had an improper motive. I would say the same for each of the three other statements the Court's Order questions even if they were construed as statements of facts that counsel came to know were no longer true.

20.    Further proof of counsel's good-faith uncertainty of what might transpire at the October 23 status conference, and therefore proof of the absence of an improper motive, is counsel's October 22 "motion for clarification" of the Court's order to subpoena the Trial ADA, implying thereby their expectation that

7

the evidentiary hearing the Court ordered for November 10 would proceed. Ex. B at ¶ 45.

### B. Candor to the Court Outside of Rule 3.3

21.     The Court cites cases that hold that Rule 3.3 is not the exclusive source of a lawyer's duty of candor. I agree, but great care is required. A general statement of a lawyer's duty cannot be decoupled from the facts of the case that contains the statement. There is no free-floating duty to advise a court of "any development which may conceivably affect an outcome" of a litigation. Order at ¶ 17 (quoting case law). Applied without qualification, that broad standard would, for example, require counsel to disclose new evidence probative of a claim or defense, new evidence impeaching an opponent's witness, and changes in position that would make settlement more likely, as these became known.

22.     Courts applying a duty of candor outside Rule 3.3 interpret it narrowly, as shown by the facts in the cases the Order cites. Those cases reveal egregious behavior, unlike the facts here. For example, in *United States v. Shaffer Equipment Co.*, 11 F.3d 450 (4th Cir. 1993), government lawyers concealed from the court the fact that their expert witness, who was responsible for compilation of the administrative record on which the court would rely, had lied under oath about his qualifications, casting doubt on the credibility of that record. In *In re Universal Minerals, Inc.*, 755 F.2d 309 (3d Cir. 1985), counsel ignored repeated requests from the court to address the opponent's claim that the court lacked jurisdiction to hear the case, a claim that was in fact true. In *Walter v. Southeastern Pennsylvania Transportation Authority*, No. 05-418, 2007 WL 966227 (E.D. Pa. Mar. 28, 2007), plaintiff's counsel failed to inform the court

of a fact, then unknown to defense counsel, that suggested that the action might be moot, which if so would deprive the court of jurisdiction. In *Fusari v. Steinberg*, 419 U.S. 379 (1975), the lower court had enjoined certain conduct based on then-existing Connecticut law. The parties failed to inform the Supreme Court that the "Connecticut Legislature appears to have changed the [unemployment compensation] system at least in part to expedite administrative appeals and thereby treat claimants more fairly . . . thus meeting in part, at least, the basis of the attack on the system." *Id.* at 390 (Burger, C.J. concurring).

23.    In each of these four cases, there was a failure to inform the court of material developments that were directly related to the legal resolution of the litigation. In several of the cases the Court cites, counsel failed to inform the court of new facts or law for a significant period of time. Indeed, in *Fusari*, counsel appear never to have informed the Supreme Court of the change in the law. *Id.* Here the Court was notified within days.

24.    I appreciate that the Court believes it is important to express its displeasure with what it perceives as counsel's failure promptly to alert it to a change in circumstances sooner than they did. That goal is achieved in the Court's Order. Such remedy as may be necessary to correct what is at most a regrettable oversight has been accomplished.

/

/

/

/

9

I declare under penalty of perjury that the foregoing is true and correct.

_____

STEPHEN GILLERS

Dated: January 7, 2021

# EXHIBIT A

Stephen Gillers

[December 2020]

# STEPHEN GILLERS

Elihu Root Professor of Law
(vice dean 1999-2004)
New York University
School of Law
40 Washington Square South
New York, NY 10012

(212) 998-6264 (tel)
(212) 995-4658 (fax)
stephen.gillers@nyu.edu

**AREAS OF TEACHING**   Regulation of Lawyers and Professional Responsibility
Evidence; Law and Literature

**PRIOR COURSES**   Media Law; Civil Procedure, Agency, Federal Courts

**PUBLICATIONS**   BOOKS AND ANTHOLOGIES:

Regulation of Lawyers:  Problems of Law and Ethics (Wolters Kluwer, 12th ed. 2021, published 11/2020).

Regulation of Lawyers:  Statutes and Standards (with Roy Simon and Andrew Perlman) (Wolters Kluwer 2019)

Journalism Under Fire: Protecting the Future of Investigative Reporting, Columbia University Press 2018.

"The Legal Industry of Tomorrow Arrived Yesterday: How Lawyers Must Respond," in The Relevant Lawyer (ABA 2015).

Regulation of the Legal Profession (Aspen 2009). This is 400+ page book  in the Aspen "Essentials" series explains  ethics rules and laws governing American lawyers and judges.

**PUBLICATIONS**   Investigating the FBI (co-Editor with P. Watters)
(continued)   (Doubleday, 1973; Ballantine, 1974)

None of Your Business:  Government Secrecy in America (co-Editor

1

Stephen Gillers

with N. Dorsen) (Viking, 1974; Penguin, 1975).

Getting Justice:  The Rights of People (Basic Books, 1971; revised paperback, New American Library, May 1973).

I'd Rather Do It Myself:  How to Set Up Your Own Law Firm (Law Journal Press, 1977).

Looking At Law School:  A Student Guide From the Society of American Law Teachers (editor and contributor) (Taplinger, 1977; NAL, 1977; revised ed., NAL, 1984; third ed., NAL, 1990).

The Rights of Lawyers and Clients (Avon, 1979).

"Four Policemen in London and Amsterdam," in R. Schrank (ed.) American Workers Abroad (MIT Press, 1979).

"Dispute Resolution in Prison:  The California Experience," and "New Faces in the Neighborhood Mediating the Forest Hills Housing Dispute," both in R. Goldmann (ed.) Roundtable Justice:  Case Studies in Conflict Resolution (Westview Press, 1980).

"The American Legal Profession," in A. Morrison (ed.), Fundamentals of American Law (Oxford University Press 1996).

The Elsinore Appeal: People v. Hamlet (St. Martin's Press 1996). This book contains the text of Hamlet together with briefs and oral argument for and against affirmance of Prince Hamlet's (imaginary) murder convictions.  The book arose out of a symposium sponsored by the Association of the Bar of the City of New York.

"In the Pink Room," in Legal Ethics: Law Stories (D. Rhode & D. Luban, eds.) (Foundation Press, 2006) (also published as a freestanding monograph).

2

Stephen Gillers

PUBLICATIONS
(continued)

ARTICLES:

"Directly Adverse" Means *Directly* Adverse: How Courts Have Misread Rule 1.7(a)(1) and Why It Matters, 98 Denver L. Rev. ____ (2021).

A Rule to Forbid Bias and Harassment in Law Practice: A Guide for State Courts Considering Model Rule 8.4(g), 30 Geo. J. Legal Ethics 195 (2017)

Panel Discussion, Using the Licensing Power of the Administrative State: Model Rule 8.4(g), 31 Regent U. L. Rev. 31 (2018-2019). This was a panel discussion at the annual meeting of the Federalist Society, transcribed, edited, and printed the Regent Law Review.

Uniform Legal Ethics Rules? No – An Elusive Dream Not Worth the Chase, 22 The Professional Lawyer __ (2014)

The Two-Year Law Degree: Undesirable but Perhaps Unavoidable, 2013 N.Y.U. J. Legis. & Pub. Pol'y Quorum 4 (2013)

How To Make Rules for Lawyers: The Professional Responsibility of the Legal Profession, 40 Pepperdine L. Rev. 365 (2013) (Symposium issue on *The Lawyer of the Future*).

A Profession, If You Can Keep It: How Information Technology and Fading Borders Are Reshaping the Law Marketplace and What We Should Do About It, 63 Hastings L.J. 953 (2012)

Guns, Fruit, Drugs, and Documents: A Criminal Defense Lawyer's Responsibility for Real Evidence, 63 Stan. L. Rev. 813 (2011)

Is Law (Still) An Honorable Profession?, 19 Professional Lawyer 23 (2009)(based on a talk at Central Synagogue in Manhattan).

Professional Identity: 2011 Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

Choosing and Working with Estate and Foundation Counsel to Secure an Artistic and Philanthropic Legacy, in The Artist as Philanthropist, volume 2, page 293 (The Aspen Institute Program on Philanthropy and Social Innovation 2010)

Virtual Clients:  An Idea in Search of a Theory (with Limits),  42 Valparaiso L. Rev. 797 (2008)  (Tabor lecture).

Stephen Gillers

The "Charles Stimson" Rule and Three Other Proposals to Protect Lawyers From Lawyers, 36 Hofstra L. Rev. 323 (2007)

A Tendency to Deprave and Corrupt:  The Transformation of American Obscenity Law from *Hicklin* to *Ulysses II*, 85 Washington U. L. Rev. 215 (2007)

Some Problem with Model Rule 5.6(a), Professional Lawyer (ABA 2007 Symposium Issue).

Monroe Freedman's Solution to the Criminal Defense Lawyer's Trilemma Is Wrong as a Matter of Policy and Constitutional Law, 34 Hofstra L. Rev. 821 (2006)

ARTICLES
(continued)

"In the Pink Room," TriQuarterly 124.

Free the Lawyers:  A Proposal to Permit No-Sue Promises in Settlement Agreements, 18 Georgetown J. Legal Ethics 291 (2005) (with Richard W. Painter).

Lessons from the Multijurisdictional Practice Commission: The Art of Making Change, 44 Ariz. L. Rev. 685 (2002).

Speak No Evil: Settlement Agreements Conditioned On Noncooperation Are Illegal and Unethical, 31 Hofstra L. Rev.  1  (2002) (reprinted at 52 Defense L.J. 769 (2003)).

 "If Elected, I Promise [_____]"–What Should Judicial Candidates Be Allowed to Say?  35 Ind. L. Rev. 735 (2002).

Legal Ethics: Art or Theory?, 58 Annual Survey Am. L. 49 (2001).

The Anxiety of Influence, 27 Fla. St. L. Rev. 123 (1999) (discussing rules that restrict multidisciplinary practice.

Can a Good Lawyer Be a Bad Person? 2 J. Inst. Study of Legal Ethics 131 (1999) (paper delivered at conference "Legal Ethics: Access to Justice" at Hofstra University School of Law, April 5-7, 1998).

More About Us: Another Take on the Abusive Use of Legal Ethics Rules, 11 Geo. J. Legal Ethics 843 (1998).

Caveat Client: How the Proposed Final Draft of the Restatement of the Law Governing Lawyers Fails to Protect Unsophisticated Consumers in Fee Agreements With Lawyers, 10 Geo. J. Legal Ethics 581 (1997).

Stephen Gillers

Participant, <u>Ethical Issues Arising From Congressional Limitations on Legal Services Lawyers</u>, 25 Fordham Urban Law Journal 357 (1998) (panel discussion).

<u>The Year: 2075, the Product: Law</u>, 1 J. Inst. Study of Legal Ethics 285 (1996) (paper delivered on the future of the legal profession at Hofstra University Law School's conference "Legal Ethics: The Core Issues").

<u>Getting Personal</u>, 58 Law & Contemp. Probs. 61 (Summer/Autumn 1995) (contribution to symposium on teaching legal ethics).

ARTICLES
(continued)

<u>Against the Wall</u>, 43 J. Legal Ed. 405 (1993) (ethical considerations for the scholar as advocate).

Participant, Disqualification of Judges (The Sarokin Matter): Is It a <u>Threat to Judicial Independence?</u>, 58 Brooklyn L. Rev. 1063 (1993) (panel discussion).

<u>The New Old Idea of Professionalism</u>, 47 The Record of the Assoc Bar of the City of N.Y. 147 (March 1992).

<u>The Case of Jane Loring-Kraft: Parent, Lawyer</u>, 4 Geo. J. Legal Ethics 115 (1990).

<u>Taking L.A. Law More Seriously</u>, 98 Yale L.J. 1607 (1989) (contribution to symposium on popular legal culture).

<u>Protecting Lawyers Who Just Say No</u>, 5 Ga. St. L. Rev. 1 (1988) (article based on Henry J. Miller Distinguished Lecture delivered at Georgia State University College of Law).

<u>Model Rule 1.13(c) Gives the Wrong Answer to the Question of Corporate Counsel Disclosure</u>, 1 Geo. J. Legal Ethics 289 (1987).

<u>The Compelling Case Against Robert H. Bork</u>, 9 Cardozo L. Rev. 33 (1987).

Ethics That Bite:  Lawyers' Liability to Third Parties, 13 Litigation 8 (Winter 1987).

<u>Can a Good Lawyer Be a Bad Person?</u>, 84 Mich. L. Rev. 1011 (1986).

Proving the Prejudice of Death-Qualified Juries After Adams v. Texas<u>:  An Essay Review of </u>Life in the Balance, 47 Pitt. L. Rev. 219

Stephen Gillers

(1985), cited in Lockhart v. McCree, 476 U.S. 162, 197, 201 (1986) (Marshall, J., dissenting).

What We Talked About When We Talked About Ethics: A Critical View of the Model Rules, 46 Ohio St. L.J. 243 (1985).

The Quality of Mercy:  Constitutional Accuracy at the Selection Stage of Capital Sentencing, 18 U.C. Davis L. Rev. 1037 (1985).

Berger Redux, 92 Yale L.J. 731 (1983) (Review of Death Penalties by Raoul Berger).

ARTICLES
(continued)

 Selective Incapacitation:  Does It Offer More or Less?, 38 The Record of the Assoc. Bar City of N.Y. 379 (1983).

Great Expectations:  Conceptions of Lawyers at the Angle of Entry, 33 J. Legal Ed. 662 (1983).

Perspectives on the Judicial Function in Criminal Justice (Monograph, Assoc. Bar City of N.Y., 1982).

Deciding Who Dies, 129 U. Pa. L. Rev. 1 (1980) (quoted and cited as "valuable" in Spaziano v. Florida, 468 U.S. 447, 487 n.33 (1984) (Stevens, J., dissenting); also cited in Zant v. Stephens, 462 U.S. 862, 878 n.17, 879 n.19 (1983); Lockhart v. McCree, 476 U.S. 162, 191 (1986) (Marshall, J., dissenting); Callins v. Collins, 114 S.Ct. 1127, 1134 n.4 (1994) (Blackmun, J., dissenting); and Harris v. Alabama, 115 S.Ct. 1031, 1038-39 (1995) (Stevens, J., dissenting).

Numerous articles in various publications, including The New York Times, The Nation, American Lawyer, The New York Law Journal, The National Law Journal, Newsday, and the ABA Journal.  See below for selected bibliography.

AWARDS

**2011 Recipient, Michael Franck Award.** Michael Franck Award from the ABA's Center for Professional Responsibility. The Award is given annually for "significant contributions to the work of the organized bar….noteworthy scholarly contributions made in academic settings, [and] creative judicial or legislative initiatives undertaken to advance the professionalism of lawyers…are also given consideration."

 **Outstanding Scholar Award (2015),** Given Annually by the American Bar Foundation.

6

| | |
|---|---|
| **DVDS** | "Adventures in Legal Ethics and Further Adventures in Legal Ethics": videotape of thirteen dramatic vignettes professionally produced and directed and raising issues of legal ethics.  Author, Producer.  (1994) |

"Dinner at Sharswood's Café," a videotape raising legal ethics issues. Author,  Producer. (1996)

"Amanda Kumar's Case," a 38-minute story raising more than two dozen legal ethics issues.  Author. (1998)

**TRIBUTES**      To Honorable Gus J. Solomon, printed at 749 Federal Supplement LXXXI and XCII (1991).

Rules That Work "On The Ground": Judith Kaye's Approach to the Law of Lawyering, 92 N.Y.U. L. Rev. 45 (2017).

Truth, Justice, and White Paper, 27 Harv. Civ. R. Civ. Lib. L. Rev. 315 (1992) (to Norman Dorsen).

Irving Younger: Scenes from the Public Life, 73 Minn. L. Rev. 797 (1989).

**OTHER TEACHING**      Visiting Professor of Law, Harvard Law School, Winter 1988 Semester;

Adjunct Professor of Law, Yeshiva University, Cardozo Law School, Spring 1986, Spring 1987, and Fall 1988 Semesters.
Course:  The Legal Profession.

Adjunct Associate Professor of Law, Brooklyn Law School, 1976-78.

National University of Singapore.

University of Vienna.

**PRIOR EMPLOYMENT**      1973 - 1978
Private practice of law
Warner and Gillers, P.C. (1975-78)

1974 - 1978
Executive Director
Society of American Law Teachers, Inc.

7

Stephen Gillers

<u>1971 - 1973</u>
Executive Director, Committee for
Public Justice

<u>1969 - 1971</u>
Associate, Paul, Weiss, Rifkind,
Wharton & Garrison

<u>1968 - 1969</u>
Judicial Clerk to Chief Judge
Gus J. Solomon, Federal District Court
for the District of Oregon, Portland, Oregon

Stephen Gillers

**SELECTED**
**TESTIMONY**

Testimony on "Nomination of Sandra Day O'Connor to the Supreme Court of the United States", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., Sept. 11, 1981.

Testimony on S. 2216, "Habeas Corpus Reform Act of 1982", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 2d Sess., April 1, 1982.

Testimony on H.R. 5679, "Criminal Code Revision Act of 1981", Hearings, before the House of Representatives, Committee on the Judiciary, 97th Congress, 2d Sess., April 22, 1982.

Testimony on S. 653, "Habeas Corpus Procedures Amendment Act of 1981", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., November 13, 1981.

Testimony on S. 8875 and A. 11279, "A Proposed Code of Evidence for the State of New York", before Senate and Assembly Codes and Judiciary Committees, February 25, 1983.

Testimony before A.B.A. Commission on Women in the Profession, Philadelphia, February 6, 1988.

Testimony on the nomination of William Lucas to be Assistant Attorney General for Civil Rights, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., July 20, 1989.

Testimony on the nomination of Vaughn Walker to be United States District Judge for the Northern District of California, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., November 9, 1989.

**PUBLIC**
**LECTURES**
(partial list)

Tabor Lecture, Valparaiso University School of Law, April 12, 2007. This event consisted of two lectures. A public lecture was entitled "Here's the Gun: A Lawyer's Responsibility for Real Evidence." The Bench and Bar lecture, which will be published in the school's law review, is entitled "Virtual Clients: An Idea in Search of a Theory (With Limits)."

Paul M. Van Arsdell, Jr., Memorial Lecture, University of Illinois, College of Law, March 7, 2005: "Do Lawyers Share Moral Responsibility for Torture at Guantanamo and Abu Ghraib?"

Howard Lichtenstein Distinguished Professorship of Legal Ethics Lecture Series, "In Praise of Confidentiality (and Its Exceptions)," delivered at Hofstra University School of Law, November 12, 2003.

9

Stephen Gillers

Henry J. Miller Distinguished Lecture, Georgia State University College of Law, May 11, 1988.  "Protecting Lawyers Who Just Say No."

First Annual South Carolina Bar Foundation Lecture, April 9, 1992, University of South Carolina Law School, Columbia, South Carolina.  "Is the Legal Profession Dead?  Yearning to Be Special in an Ordinary Age."

Philip B. Blank Memorial Forum on Attorney Ethics, Pace University School of Law, April 8, 1992.  "The Owl and the Fox: The Transformation of Legal Work in a Commodity Culture."

Speaker on Judicial Ethics, ABA Appellate Judges' Seminar and Flaschner Judicial Institute, September 29, 1993, Boston, Massachusetts.

Baker-McKenzie Ethics Lecture, Loyola University Chicago School of Law, October 13, 1993, Chicago, Illinois ("Bias Issues in Legal Ethics:  Two Unfinished Dramas").

The Sibley Lecture, University of Georgia School of Law, Athens, Georgia, November 10, 1993 ("Telling Stories in School: The Pedagogy of Legal Ethics").

Participant, "Ethics in America" series ( PBS 2007), produced by Columbia University Seminars on Media and Society.

Participant, "Ethics in America" series, broadcast on PBS February and March 1989, produced by Columbia University Seminars on Media and Society.

 Participant, "The Constitution: That Delicate Balance, Part II" series, broadcast on PBS February and March 1992, produced by Columbia University Seminars on Media and Society.

Lecturer on legal ethics and allied subjects in the U.S. and abroad at hundreds of seminars and conferences, *including (partial list):*  CLE events and conferences organized by private law firms, corporate law departments, the judicial conferences of the District of Columbia and the Second, Fourth, Sixth, Ninth and Federal Circuits; American Bar Association; The Paris (Fr.) Bar; The Colombia Bar; The Federalist Society; Federal Bar Council; New York State Judiciary; New York City Corporation Counsel; American Museum of Natural History; Practicing Law Institute; Law Journal Seminars; state, local and specialty bar associations (including in Oregon, Nebraska, Illinois, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, and Georgia).

Stephen Gillers

**LEGAL AND**
**PUBLIC SERVICE**
**ACTIVITIES**

<u>Member</u>, ABA 20/20 Commission, 2009- 2013 (appointed by the ABA President to study the future of lawyer regulation).

<u>Chair</u>, American Bar Association Center for Professional Responsibility, Policy Implementation Committee, 2004-2008 (Member 2002-2010).

<u>Member</u>, American Bar Association Commission on Multijurisdictional Practice, 2000-2002.

<u>Consultant</u>, Task Force on Lawyer Advertising of the New York State Bar Association (2005).

Retained by the New Jersey Supreme Court, in connection with the Court's review of the lawyer disciplinary system in New Jersey, to provide an "analysis of the strengths and weaknesses of California's 'centralized' disciplinary system" and to "report on the quality, efficiency, timeliness, and cost effectiveness of the California system...both on its own and compared with the system recommended for New Jersey by the Ethics Commission."  Report filed December 1993.  Oral presentation to the Court, March 1994.

<u>Reporter</u>, Appellate Judges Conference, Commission on Judicial participation in the American Bar Association, (October 1990-August 1991).

<u>Member</u>, David Dinkins Mayoral Transition Search Committee (Legal and Law Enforcement, 1989).

<u>Member</u>, Committee on the Profession, Association of the Bar of the City of New York (1989-1992)

<u>Member</u>, Executive Committee of Professional Responsibility Section, Association of American Law Schools (1985-1991).

<u>Chair</u>, 1989-90 (organized and moderated Section presentation at 1990 AALS Convention on proposals to change the ABA Code of Judicial Conduct).

<u>Counsel</u>, New York State Blue Ribbon Commission to Review Legislative Practices in Relation to Political Campaign Activities of Legislative Employees (1987-88).

<u>Administrator</u>, Independent Democratic Judicial Screening Panel, New York State Supreme Court (1981).

Stephen Gillers

<u>Member</u>, Departmental Disciplinary Committee, First Judicial Department  (1980 - 1983).

<u>Member</u>, Committee on Professional and Judicial Ethics, Association of the Bar of the City of New York (1979 - 1982).

**BAR MEMBERSHIPS**       STATE:

New York (1968)

FEDERAL:

United States Supreme Court (1972);
Second Circuit (1970);
Southern District of New York (1970);
Eastern District of New York (1970)

**LEGAL EDUCATION**       J.D. <u>cum</u> <u>laude</u>, NYU Law School, 1968
Order of the Coif (1968)
Dean's List (1966-68)
University Honors Scholar (1967-68)

**PRELEGAL**              B.A. June 1964, City University of New York
**EDUCATION**             (Brooklyn College)

(*Partial* bibliography of occasional non-academic article: This list excludes publications before 1978, when I started teaching. There may be some articles inadvertently omitted through oversight. Some publications in the first two or three years were compiled retroactively.)

1. Standing Before the Bar, Bearing Gifts, New York Times, July 30, 1978.

2. Lawyers: Paid for Doing Nothing?, New York Times, June 13, 1979.

3. Judgeships on the Merits, The Nation, September 22, 1979.

4. Entrapment, Where Is Thy Sting?, The Nation, February 23, 1980.

5. Advice and Consent, New York Times, September 12, 1981.

Stephen Gillers

6. Lawyers' Silence: Wrong . . . , New York Times, February 14, 1983.

7. The Warren Court - It Still Lives, The Nation, September 17, 1983.

8. Burger's Warren Court, New York Times, September 25, 1983.

9. "I Will Never Forget His Face!", New York Times, April 21, 1984.

10. Warren Court's Landmarks Still Stand, Newsday, July 29, 1984.

11. Von Bulow, And Other Soap Operas, New York Times, May 5, 1985.

12. Statewide Study of Sanctions Needed for Lawyers' Misconduct, New York Law Journal, June 6, 1985.

13. Preventing Unethical Behavior - Something New in Model Rules, New York Law Journal, August 30, 1985.

14. Proposed Model Rules Superior to State's Code, New York Law Journal, October 21, 1985.

15. Five Ways Proposed to Improve Lawyer Discipline in New York, New York Law Journal, January 8, 1986.

16. Poor Man, Poor Lawyer, New York Times, February 28, 1986.

17. Proposals To Repair Cracks in Ethical Legal Behavior, New York Law Journal, April 17, 1986.

18. Unethical Conduct: How to Deter It Through Education, Bar Leader (May/June 1986).

19. The New Negotiation Ethics - Or Did Herb's Lawyer Do Wrong? New York Law Journal, June 2, 1986.

20. The Real Stakes in Tort Reform, The Nation, July 19-26, 1986.

21. Bernhardt Goetz: Vigilante Or Victim?, Toronto Star, September 10, 1986.

22. The Message That the Goetz Trial Will Send, Newsday, August 31, 1986.

23. Amending the Ethics Code - Solicitation, Pre-Paid Plans, Fees, New York Law Journal, November 10, 1986.

24. Amending the Ethics Code - Conflicts of Interest, Screening, New York Law Journal, November 12, 1986.

25. Amending the Ethics Code - Confidentiality and Other Matters, New York Law Journal, November 13, 1986.

26. No-Risk Arbs Meet Risk Justice, New York Times, November 23, 1986.

27. The Meese Lie, The Nation, February 21, 1987.

28. Amending State Ethics Code - Conflicts of Interest Gone Awry, New York Law Journal, May 18, 1987.

13

Stephen Gillers

29. "The Lawyers Said It Was Legal," New York Times, June 1, 1987.

30. Feminists vs. Civil Libertarians, New York Times, November 8, 1987.

31. Lessons for the Next Round in Picking a Justice, Newsday, November 11, 1987.

32. We've Winked For Too Long, National Law Journal, December 21, 1987 (judicial membership in exclusionary clubs).

33. No More Meeses, New York Times, May 1, 1988.

34. In Search of Roy Cohn, ABA Journal, June 1, 1988 (book review).

35. Do Brawley Lawyers Risk Serious Discipline?, New York Law Journal, June 22, 1988.

36. Have the Brawley Lawyers Broken the Law?, New York Times, July 2, 1988.

37. Report Demonstrates Why Meese is Unfit to Be Attorney General, Atlanta Journal and Constitution, July 24, 1988.

38. Ethical Questions for Prosecutors in Corporate-Crime Investigations, New York Law Journal, September 6, 1988.

39. Restoring Faith at Justice, National Law Journal, November 21, 1988.

40. Is Bush Repeating Rockefeller's Folly?, New York Times, September 11, 1989.

41. Standards Time, The Nation, January 29, 1990 (on the subject of legislative ethics).

42. Abused Children vs. The Bill of Rights, New York Times, August 3, 1990.

43. Words Into Deeds: Counselor, Can You Spare a Buck?, ABA Journal, November 1990.

44. Bad Apples, ABA Journal at 96 (March 1991) (book review).

45. The Gotti Lawyers and the Sixth Amendment, New York Law Journal, August 12, 1991.

46. Justice or Just Us? The Door to Dan Quayle's Courthouse Only Swings One Way, ABA Journal (June 1992) at 109.

47. Fighting Words (What was once comical is now costly), ABA Journal (August 1992) at 102.

48. Sensitivity Training: A New Way to Sharpen Your Skills At Spotting Ethics Conflicts, ABA Journal (October 1992) at 107.

49. Under Color of Law: Second Circuit Expands Section 1983 Liability for Government Lawyers, ABA Journal (December 1992) at 121.

50. Cleaning Up the S&L Mess: Courts Are Taking the Duty to Investigate Seriously, ABA Journal (February 1993) at 93.

51. All Non-Refundable Fee Agreements Are Not Created Equal, New York Law Journal (February 3, 1993) at 1. (Analyzing appellate decision prohibiting non-refundable fees.)

Stephen Gillers

52. The Packwood Case: The Senate Is Also on Trial, The Nation (March 29, 1993) at 404.

53. Conflict of Laws: Real-World Rules for Interstate Regulation of Practice, ABA Journal (April 1993) at 111.

54. Packwood II, The Nation (May 10, 1993) at 617.

55. Generation Gap, ABA Journal (June 1993) at 101. (On the use of a boycott in response to the Colorado anti-gay initiative.)

56. Future Shocks, ABA Journal (August 1993) at 104. (Looking back on the practice of law in the 21st century from the year 2103.)

57. A Rule Without a Reason, ABA Journal (October 1993) at 118. (Criticism of the prohibition in Rule 5.6(b) against a lawyer agreeing not to restrict future practice in connection with a settlement.)

58. Too Old to Judge?, ABA Journal (December 1993) at 94. (Supreme Court justices have life tenure. Maybe they should not.)

59. Truth or Consequences, ABA Journal (February 1994) at 103. (Discovery obligations.)

60. "Ethical Cannons," in Symposium - Twenty Years of Change, Litigation (Fall 1993).

61. Stretched Beyond the Limit, Legal Times (March 21, 1994) at 37. (Analysis of the office of Counsel to the President in light of Bernard Nussbaum's resignation.) [Same article was reprinted in the Connecticut Law Tribune, the Fulton County (Atlanta) Daily Report, and the Recorder (San Francisco).]

62. Putting Clients First, ABA Journal (April 1994) at 111. (Discussing cases on lawyers' fiduciary duty.)

63. Grisham's Law, The Nation (April 18, 1994) at 509. (The effect of popular culture on Whitewater reporting.)

64. The Elsinore Appeal: "People v. Hamlet", New York Law Journal (October 11, 1994) at 3. (Brief for Appellee, State of Denmark). (This was a mock appeal from Hamlet's conviction for the murder of Claudius, Polonius, Ophelia, Laertes, Rosencrantz & Gildenstern, held at the Association of the Bar of the City of New York on October 11, 1994.)

65. Billing for Costs and Disbursements: What Law Firms Can Charge and Clients Can Expect, monograph published 1995 by Pitney Bowes Management Services.

66. Clinton Has A Right To Privacy, N.Y. Times, 12/21/95, at ____.

67. "'Filegate' Was Bad Enough. Now This?," N.Y. Times, 7/5/96, at A23. (Article criticizing proposal to privatize certain security investigations of government personnel.)

68. "Whitewater: How to Build a Case Using a Tainted Witness," Los Angeles Times, 2/16/97, at M1.

69. "Hillary Clinton Loses Her Rights," New York Times, 5/4/97, at E15.

70. "Shakespeare on Trials," IV Federal Bar Council News 16 (June 1997).

71. "Florida Backs Out On a Deal," New York Times, 10/10/97, at A23.

72. "The Perjury Loophole," New York Times, 2/18/98, at A21 (discussion of perjury in connection with Kenneth Starr's investigation of President Clinton).

73. "Any Method to Ginsburg's Madness?" Los Angeles Times, 3/15/98, at M1 (discussion of William Ginsburg's public defense of Monica Lewinsky).

74. "Whitewater Made Easy," The Nation, 6/1/98, at 8.

75. "A Highly Strategic Legal Chess Game," Los Angeles Times, June 7, 1998, at M1 (Starr-Clinton legal maneuvers).

76. "To Sleep . . . Perchance, to Dream," New York Law Journal, July 8, 1998, at 2. (Humorous article about bored jurors.)

77. "Clinton Is No Ordinary Witness," New York Times, 7/28/98, at A15.

78. "The High Cost of an Ethical Bar," The American Lawyer, July/August 1998, at 87.

79. "Clinton's Choice: Tell Truth or Dare to Gamble," Los Angeles Times, August 2, 1998, at M1.

80. "Accurate Lies: The Legal World of Oxymorons," Los Angeles Times, August 30, 1998, at M1.

81. "A Fool For a Client?" The American Lawyer, October 1998, at 74. (President Clinton's legal representation in the Lewinsky representation.)

82. "The Presidency: Out to End Clinton's Mess and Be Happy," Los Angeles Times, October 4, 1998, at M1.

83. "Protecting Their Own," The American Lawyer, November 1998, at 118.

84. "Can't We All Just Practice Together: Taking Down 'Trade Barriers' on Lawyers Here and Abroad," Legal Times, November 9, 1998, at 32.

85. "Beyond the Impeachment Spectacle," Los Angeles Times, November 22, 1998, at M1.

86. "The Perjury Precedent," New York Times, December 28, 1998, at A27.

87. "From the Same Set of Facts: A Tale of Two Stories," Los Angeles Times, January 17, 1999, at M1 (about the Clinton impeachment trial).

88. "The Decline and Fall of Kenneth Starr," Los Angeles Times, February 7, 1999, at M1.

89. "The Truth About Impeachment," The American Lawyer, March 1999, p. 131.

Stephen Gillers

90. "The Double Standard," New York Times Book Review, March 21, 1999, at 13 (review of No Equal Justice by David Cole).

91. "Four Officers, One Likely Strategy," New York Times, Saturday, April 3, 1999, at A15.

92. "The Man in the Middle: Did George Ventura Step Over the Ethical Line?" The American Lawyer, May 1999, p. 80 (discussion of lawyer whistleblowing in light of State v. George Ventura). (Reprinted as "Whistleblower, Esq." in New York Law Journal, May 26, 1999 at page 2.)

93. "Your Client Is A Corporation – Are Its Affiliates Clients Too?" The New York Professional Responsibility Report, May 1999 , at 1.

94. "Job Talk (Scenes from the Academic Life)," The American Lawyer, July 1999, at 161. (Satire about law school hiring.)

95. "The Other Y2K Crisis," The Nation, July 26/August 2, 1999, at 4 (editorial about the year 2000 electoral races).

96. "Walking the Confidentiality Tightrope," ACCA Docket 20 (September/October 1999) (remarks at ACCA's national conference in 1998).

97. "Things Old & New – The Code Amendments," New York Professional Responsibility Report (September 1999), at 1.

98. "Clinton's Chance to Play the King," New York Times, Sept. 20, 1999 at A17.

99. "Overprivileged," American Lawyer, October 1999 at 37. (Discussion of First Amendment protection for journalists.)

100. "Controlling Conflicts Between Old and New Clients," New York Professional Responsibility Report, January 2000 at 3.

101. "How To Spank Bad Lawyers," American Lawyer, February 2000 at 41.

102. "A Weak Case, But a Brave Prosecution," New York Times, Wednesday, March 1, 2000 at A23 (the Diallo case).

103. "Conflicts of Interest in Malpractice Cases," New York Professional Responsibility Report, March 2000 at 1.

104. "The Court's Picayune Power," New York Times, Thursday, April 20, 2000 at A29.

105. "Some Misrepresentations Among Corporate Lawyers," New York Professional Responsibility Report, June 2000 at 1.

106. "Was Hubbell Case About Getting Justice or Getting Even?" Los Angeles Times, June 18, 2000 at M2 (comment on the U.S. Supreme Court's decision in United States v. Hubbell, decided

Stephen Gillers

June 5, 2000).

107. "Who Owns the Privilege After a Merger?" New York Professional Responsibility Report, July 2000 at 1.

108. "Fighting the Future," The American Lawyer, July 2000 at 55.

109. "Campus Visits Deconstructed," Newsweek: How To Get Into College, 2001 Edition at 46.

110. "The Court Should Boldly Take Charge," New York Times, Tuesday, November 21, 2000 at A25 (Florida's presidential election recount).

111. "Who Says the Election Has a Dec. 12 Deadline?" New York Times, Saturday, December 2, 2000 at A19.

112. "Motive Is Everything in the Marc Rich Pardon," New York Times, Saturday, February 17, 2001.

113. "For Justice To Be Blind, Must Judges Be Mute?" New York Times, Sunday, March 4, 2001 at Section 4, page 3.

114. "Should Supreme Court Justices Have Life Tenure?" Reprinted in The Supreme Court and Its Justices (Choper J., ed.) (ABA 2001).

115. Professionalism Symposium, 52 South Carolina L. Rev. 55 (2001) (closing remarks).

116. "No Lawyers To Call," New York Times, Monday, December 3, 2001 at A19 (ethical and constitutional obligations that will prevent lawyers from participating in military tribunals).

117. "Let Judicial Candidates Speak," New York Times, Thursday, March 28, 2002 at A31.

118. "The Flaw in the Andersen Verdict," New York Times, Tuesday, June 18, 2002 at A23.

119. "Why Judges Should Make Court Documents Public," New York Times, Saturday, November 30, 2002 at A17.

120. "It's an MJP World," ABA Journal, December 2002 at 51.

121. "Upholding the Law as Pretrial Publicity Goes Global," New York Times, Sunday, April 27, 2003, Sec. 4 at 14.

122. "Court-Sanctioned Secrets Can Kill," Los Angeles Times, Wednesday, May 14, 2003 (reprinted May 15, 2003 in Newsday).

123. "Make a List," New York Times, June 11, 2003 at 31 (advocating changes in the methods of judicial selection).

124. "Conflicted About Martha?" American Lawyer (September 2003) (analysis of Martha Stewart indictment).

18

Stephen Gillers

125. "The Prudent Jurist," Legal Affairs, January/February 2004.

126. "On Knowing the Basic Rules of Advocacy," New York Times, February 8, 2004, Sec. 4 at 2 (cross-examination in the Martha Stewart trial).

127. "The Prudent Jurist," Legal Affairs, March/April 2004.

128. "Scalia's Flawed Judgment," The Nation, April 19, 2004 at 21.

129. "Scholars, Hucksters, Copycats, Frauds," Washington Post, April 25, 2004 at B3 (Outlook) (discussion of ethics of academics who put their names on newspaper opinion pieces written by industry).

130. "The Prudent Jurist," Legal Affairs, May/June 2004 at 17.

131. "Multijurisdictional Practice of Law: Merging Theory With Practice," 73 The Bar Examiner 28 (May 2004)

132. "Tortured Reasoning," American Lawyer (July 2004) (analysis of government lawyer memos addressing the application of various treaties and laws to the treatment of Afghan prisoners).

133. "Paying the Price of a Good Defense," New York Times, August 13, 2004.

134. "Improper Advances: Talking Dream Jobs with the Judge Out of Court," Slate.com, August17, 2005 (with D. Luban and S. Lubet).

135. "Roberts' Bad Decision," Los Angeles Times, September. 13, 2005 (with D. Luban and S. Lubet).

136. "No Privilege for Miers," The Nation, November 7, 2005

137. "Senators, Don't Rubber-Stamp," USA Today, January 5, 2006 at 13A (discussing the Senate's advise and consent responsibility in connection with Alito nomination).

138. Ethics Column, American Lawyer, page 61 (January 2006) (with Deborah Rhode).

139. Ethics Column, American Lawyer, page 63 (April 2006) (with Deborah Rhode).

140. "Bush Postpones 2008 Election," The Nation, August 14/21, 2006 (satire).

141. "Free the Ulysses Two: Joyce's First U.S. Publishers Were Convicted of Obscenity. It's Time to Clear Them." The Nation, February 19, 2007.

142. "Twenty Years of Legal Ethics: Past, Present, and Future," 20 Georgetown J. Legal Ethics 321 (2007) (symposium celebrating the 20th anniversary of the journal).

143. "The Torture Memos," The Nation, April 28, 2008.

144. "Bar None," American Lawyer (October 2008) (globalization of law practice and how it will effect regulation of the bar).

Stephen Gillers

145. 2011 Michael Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

146. "Time to Adapt to a Different Marketplace," New York Law Journal, March 27, 2012.

147. "The Supreme Court Needs a Code of Ethics," Politico (Aug. 8, 2013) (with Charles Geyh).

148. "Albany Is a Cesspool. Here's How to Clean It Up," The Nation (online), January 26, 2015.

149. "Hillary Clinton's Ethical Challenge," The Nation (online), June 9, 2015

150. "Here's How Congress Can Hold Trump Accountable for His Business Conflicts," The Nation (online), January 12, 2017.

# EXHIBIT B

**Martinez Procedural History Outline for Expert Declaration**

1.      Antonio Martinez was arrested in Philadelphia in 1989 and charged with the shooting deaths of two men four years earlier, in February 1985.  Although the prosecution's case against him was far from compelling, he was convicted in 1990 and sentenced to life imprisonment without parole. Three decades of appeals and post-conviction litigation were unsuccessful.

2.      In 2018, Martinez, with the assistance of another prisoner, filed in the U.S. District Court for the Eastern District of Pennsylvania a motion under Fed. R. Civ. P. 60(b) to re-open his prior habeas corpus proceedings before Honorable Mitchell S. Goldberg.

3.      The Philadelphia District Attorney's Office assigned an Assistant District Attorney in its Law Division to respond to the motion.  That attorney reviewed the Philadelphia Police Department homicide file ("homicide file") and discovered multiple documents, which appeared to have never been disclosed to Martinez or his counsel and which contained information pointing to suspects in the murders other than Martinez.

4.      The information in those documents showed that in the immediate wake of the February 1985 murders, police had conducted an extensive investigation into two brothers, Wilson and Manuel Santiago.  In that investigation, police located an eyewitness who said she saw the Santiago brothers commit the murders, and they interviewed a witness who explained why the Santiago brothers had a motive to commit the murders.  The investigation progressed to the point that prosecutors convened a grand jury to investigate the Santiago brothers.  For unexplained reasons, however, the investigation went cold, and the Santiago brothers were never charged.

5.     Because the Assistant District Attorney who located this information could find no evidence that it had been disclosed to Martinez, she referred the case to the District Attorney's Office's Conviction Integrity Unit ("CIU") on August 21, 2018.

6.     Patricia Cummings, Supervisor of the CIU, and Assistant District Attorney Thomas Gaeta, an attorney assigned to the CIU, began to review the case.

7.     On December 13, 2018, Cummings and Gaeta filed a response to Martinez's Rule 60(b) motion.  In that response, they referenced the information located in the homicide file and noted that they believed the information to have been withheld from Martinez. Although the CIU noted that 60(b) relief was inappropriate based on the arguments in Martinez's *pro se* motion, they requested that Judge Goldberg appoint counsel to represent him in the interests of justice. On that same date, Cummings and Gaeta sent Martinez a copy of the critical favorable materials located in the homicide file.

8.     On March 26, 2019, Martinez filed in the Philadelphia Court of Common Pleas an amendment to a previously filed pro se petition under Pennsylvania's Post Conviction Relief Act. In his amended petition, Martinez argued, among other things, that based on the CIU's December 2018 disclosures, the prosecution had violated *Brady v. Maryland* by failing to disclose material exculpatory evidence.

9.     In April 2019, Martinez, who had not been provided the services of an appointed attorney, retained the services of Jonathan H. Feinberg to represent him on a *pro bono* basis to challenge his conviction and sentence based on the CIU's December 2018 disclosures.

10.     In late April and early May 2019, Feinberg discussed with Cummings and Gaeta his plan to file a collateral attack on Martinez's conviction based on the December 2018 disclosures.

2

11.     In those discussions, Feinberg, Cummings, and Gaeta were aware that Martinez had filed a *pro se* pleading in the Philadelphia Court of Common Pleas that was pending before Judge Genece Brinkley.

12.     Counsel were aware, based on their personal experience and the experience of other post-conviction practitioners, that the petition would not be heard on the merits for months or even years as there was a substantial backlog of cases on Judge Brinkley's docket.  In Martinez's case, for example, the court had conducted a status conference on April 26, 2019.  At that conference, there was no discussion of the case on the merits, and the court scheduled the case for another conference eight months later, on December 27, 2019.

13.     Counsel were additionally aware that even if the case were heard on the merits, Judge Brinkley had previously denied a number of claims despite the parties' agreement that relief was warranted.  It was therefore unclear whether the state petition was a viable means to obtain relief, let alone to do so expeditiously.

14.     In light of their concerns that litigation in only the Court of Common Pleas would not lead to an expeditious resolution of the case, counsel discussed the prospect of litigating the matter in federal court with the CIU agreeing to affirmatively waive any procedural defenses to the litigation of federal habeas claims including, among other things, the lack of exhaustion of those claims in state court.

15.     On May 7, 2019, counsel executed a discovery and cooperation agreement whereby the CIU agreed to provide to Feinberg all relevant documents from the District Attorney's Office file and the police homicide file.

16.     During the next five months, the CIU disclosed to Feinberg more than 3,400 pages of documents from those files.

3

17.    Feinberg reviewed the materials, including the extensive information concerning the investigation into the Santiago brothers, and concluded that, although Martinez's trial counsel was deceased and therefore not available to provide testimony as to whether he had ever received that information, the facts and circumstances showed that the information had in fact been suppressed.  None of the information concerning the Santiago brothers was referenced in any discovery transmittal letters at the time of trial.  Nor was any of that information referenced in the transcripts of trial and post-trial proceedings or in any post-trial or appellate pleadings.  Additionally, Feinberg consulted with Martinez's post-trial counsel, Alan Yatvin, Esq., who informed Feinberg that he did not recall learning about the evidence and that, if he had learned about it, he would have made that evidence the basis of a claim for a new trial.

18.    Based on these findings and concerns about proceeding with litigation in the state courts, Feinberg informed Cummings and Gaeta that he intended to apply to the Third Circuit for leave to file a second or successive petition for writ of habeas corpus.

19.    On October 23, 2019, Cummings and Gaeta wrote to Feinberg to confirm that the District Attorney's Office would have no opposition to that application and, further, that it would affirmatively waive all procedural defenses that would preclude evaluation of the merits of Martinez's claims, including the statute of limitations, procedural default, and exhaustion.  The letter stated that the CIU elected to do so after its careful review of the case led it to conclude that a considerable amount of exculpatory material was not disclosed to Martinez prior to his trial and that there was a substantial likelihood that Martinez would not have been convicted if that material had been disclosed.  In view of these determinations and consistent with prosecutors' ethical obligations under Pa. R.P.C. 3.8, the letter stated, review of the merits of Martinez's claims should not be precluded by procedural defenses.

4

20.     On November 5, 2019, Feinberg filed in the Third Circuit a motion under 28 U.S.C. § 2244 for leave to file a second or successive habeas corpus petition, attaching the proposed habeas corpus petition, a 30-page memorandum of law, and a 552-page appendix which included the CIU's October 23 letter promising to waive all procedural defenses. The proposed habeas petition listed each of Martinez's claims, noted that they were concurrently pending in state court, and explained that their lack of exhaustion was not a bar to relief in light of the CIU's intent to waive defenses. The memorandum of law likewise noted that Martinez had filed a PCRA petition concerning the same *Brady* violations at issue in the federal petition, that Martinez did not at that time have counsel in those state court proceedings, and that the CIU had agreed to waive all procedural defenses that would otherwise preclude review of Martinez's claims on the merits.

21.     On November 26, 2019, the Third Circuit granted the motion for leave to file a second or successive habeas corpus petition, and, on November 27, 2019, the petition and related filings were docketed in the U.S. District Court for the Eastern District of Pennsylvania. Like Martinez's first petition, the case assigned to Judge Goldberg.

22.     On April 6, 2020, Cummings and Gaeta filed an Answer to Martinez's petition. The answer confirmed the representations made in Cummings and Gaeta's October 23, 2019, letter, that procedural defenses would be waived, and confirmed agreement that Martinez was entitled to habeas relief based on a violation of his rights under *Brady v. Maryland*.

23.     The CIU was mindful that prosecutors in the Eastern District of Pennsylvania generally assert each and every procedural defense in habeas proceedings, and therefore provided Judge Goldberg with a detailed explanation for the CIU's decision to waive defenses:

> Martinez's trial was infected by serious misconduct and was fundamentally unfair, and the Commonwealth cannot ignore serious doubts regarding his guilt.

5

> Accordingly, the Commonwealth will affirmatively waive [any procedural defenses]. *See* Laurie L. Levenson, *The Problem with Cynical Prosecutor's Syndrome: Rethinking A Prosecutor's Role in Post-Conviction Cases*, 20 Berkeley J. Crim. L. 335, 378-79 (2015) ("Before slavishly invoking procedural hurdles, prosecutors should consider the substance of the claim. While the court must abide by procedural rules, there is flexibility in those rules if a prosecutor is truly concerned that there has been a wrongful conviction."). The merits of Martinez's claims are properly before this Court.

Answer at 24-25.

24.     Additionally, the CIU explained to Judge Goldberg its view that the federal court was "better equipped to address his claims in an expedient fashion" because Martinez was counseled in those proceedings, because his state petition had been assigned "to a judge who is unacquainted with the record in this case, while [Judge Goldberg] has the benefit of familiarity as it recently reviewed Martinez's first habeas petition," and because the COVID-19 pandemic had essentially closed the state courts.

25.     At the time the Answer was filed, the first wave of the COVID-19 pandemic was at its height. Feinberg was concerned that Martinez was at significant risk for serious harm given that he was 72 years old and had several underlying health conditions. He therefore discussed the possibility of seeking bail pending review of the habeas petition with the CIU. After reviewing Martinez's DOC records, checking for any open detainers, and running an NCIC search, the CIU agreed that bail was appropriate. On April 8, 2020, Feinberg filed a motion for bail pending resolution of the habeas corpus proceedings, which the CIU did not oppose.

26.     Following the filing of the bail motion, Judge Goldberg conducted three on-the-record telephone conferences with counsel on April 10, 2020, April 14, 2020, and April 21, 2020.

27.     During those telephone conferences, the Court raised with counsel concern about the fact that the CIU had not spoken with Assistant District Attorney who prosecuted Martinez

6

at trial, Richard Sax.  In response, Cummings informed the Court that the CIU had not done so for several reasons. First, it was apparent from the record that none of the suppressed material was mentioned at trial or during any of Martinez's many subsequent challenges to his conviction. Given the nature of the suppressed material—evidence indicating that another person was responsible for the crime—its complete absence from the record was highly suggestive of suppression. Second, based on both a thorough review of the police and prosecution files and knowledge of the police department's historical practices regarding disclosure of evidence in homicide cases, several of the most critical pieces of evidence, including information about the eyewitness identification of the Santiago brothers, were not provided to the prosecution by the police investigators.  Even assuming Sax *had* passed along every piece of evidence in his possession, the evidence that was never provided to him was an independent and sufficient basis for relief.  Finally, Cummings informed the Court that the CIU could not credit any explanation by Sax due in part to the CIU's knowledge of his prior conduct in other cases and in the District Attorney's Office. Accordingly, the CIU determined that relief was warranted regardless of whatever explanation Sax would offer and that it was therefore unnecessary to interview him.

28.    In response to Judge Goldberg's request, counsel jointly submitted a letter to the Court on April 16, 2020, outlining which pieces of suppressed exculpatory evidence had been discovered in the homicide file and were not present in the District Attorney's Office file— including the statement of an eyewitness identifying the Santiago brothers as the shooters.  This strongly indicated, as counsel had informed Judge Goldberg in the earlier telephone conferences, that the information had been withheld by police and not the trial prosecutor.

7

29.     On April 22, 2020, the Court granted the bail motion. Although the Court permitted Martinez's release, it stated that Sax would have to testify before it would decide whether habeas relief was appropriate, noting that Mr. Martinez's conviction would not be vacated without a "thorough, on-the-record evidentiary hearing." The Court also noted that counsel's choice not to consult Sax was "somewhat troubling."

30.     Thereafter, archivists from the Pennsylvania Department of Corrections reviewed the physical file at Martinez's home institution as part of their release procedures. In that file, they found a letter from a prosecutor in Puerto Rico dated February 6, 2001, and stating that Martinez was wanted in connection with a 1985 homicide offense. Counsel had no prior information concerning that offense or the correspondence sent more than nineteen years earlier to the Department of Corrections. Cummings notified the Court of this discovery, and, on April 24, 2020, the Court entered an Order vacating its prior Order granting Martinez bail.

31.     After vacating its bail Order, Judge Goldberg emailed counsel:

> I just spoke with Tim Holmes with PA DOC to [ensure] that Mr Martinez was not released. He has now also received my revocation Order. So you know, he gently told me that there was [no] way for either of you to have known about the Puerto Rico information, which I of course assumed.

32.     Cummings informed the Court that she would make every effort to learn the status of the charges in Puerto Rico and would inform the Court of any developments on those charges.

33.     The Court conducted telephone status conferences with counsel on June 10, 2020, and August 5, 2020, to address the progress of counsel's investigation into the Puerto Rico charges and, further, the scheduling of an evidentiary hearing to address the merits of Martinez's petition.

8

34.     Earlier in 2020, without counsel's knowledge, the Philadelphia Court of Common Pleas had shifted the homicide Post Conviction Relief Act docket to the Honorable Tracy Brandeis-Roman, who worked to eliminate the backlog of cases and ensure the speedy resolution of pending petitions.  On July 2, 2020, the state court issued a *sua sponte* notice of intent to dismiss Martinez's PCRA petition as untimely under Pa. R. Crim. P. 907(1).  When he received the notice, Martinez forwarded it to Feinberg, who contacted the CIU to discuss the matter. Counsel agreed that the case should continue in federal court but that the state proceedings should be preserved as a fallback.  Accordingly, Cummings contacted the state court, informed Judge Brandeis-Roman that the case was pending in federal court and that the CIU had agreed to relief, and asked that the PCRA petition be held in abeyance.

35.     On August 31, 2020, in the federal matter, the Court entered an Order directing Cummings and Gaeta to contact Sax to determine whether he would agree to testify at an evidentiary hearing.

36.     On September 8, 2020, Cummings and Gaeta filed a Notice of Compliance informing the Court of their communications with Sax. The Notice informed the Court that the CIU had emailed Sax repeatedly, provided the court with copies of emails, and further informed the Court that Sax had claimed that there were factual inaccuracies in the answer the CIU had submitted.  However, despite repeated requests, Sax did not identify those inaccuracies.

37.     The Court conducted another telephone status conference with counsel on September 8, 2020, and informed counsel that a hearing would be scheduled to allow for testimony from Sax and any other witnesses whom counsel wished to present.

38.     On October 1, 2020, the Court entered an Order scheduling an evidentiary hearing for November 10, 2020.  The order directed that by October 22, 2020, counsel exchange

9

information about exhibits, witnesses, and stipulations.  The order also directed that by October 27, 2020, counsel file pre-hearing letter briefs addressing anticipated testimony and the parties' positions on the issues to be covered at the hearing.  Finally, the order directed the CIU to subpoena Sax to appear for the hearing.

39.    The CIU was concerned by the order that they subpoena Sax, as it had no intention of calling any witnesses at the evidentiary hearing and had serious concerns regarding whether Sax would testify truthfully.

40.    On October 8, 2020, all counsel discussed preparation for the November 10 hearing.  They reviewed the status of Martinez's state court post-conviction petition and the CIU learned that a status conference has been scheduled for October 23.  Counsel determined that proceeding in that forum might be an additional avenue for relief.

41.    On October 14, 2020, after consulting with Martinez, Feinberg entered an appearance as counsel for Martinez in the PCRA proceedings in the Philadelphia Court of Common Pleas.

42.    Counsel jointly requested a telephone conference with Judge Brandeis-Roman, which was held on October 15, 2020. Counsel discussed the case with Judge Brandeis-Roman and requested that the court consider the merits of Martinez's claims at the October 23, 2020, status conference.  Counsel informed the court that the issues had been fully briefed in federal court and that they would be able to submit supplemental pleadings in the PCRA to outline the basis for Martinez's requested relief.   Judge Brandeis-Roman informed counsel that she would endeavor to review any pleadings before the status conference and inform the parties at that conference how the court would proceed.

43. On October 17, 2020, Feinberg filed in the Philadelphia Court of Common Pleas on Martinez's behalf a supplemental petition under the Post Conviction Relief Act arguing that, among other things, he was entitled to relief due to the suppression of the exculpatory information concerning the Santiago brothers. The same day, Cummings and Gaeta filed an Answer confirming that the prosecution agreed that Martinez was entitled to relief. On October 18, the parties submitted detailed factual stipulations to the court.

44. On October 21, 2020, after several months of requests, prosecutors from Puerto Rico provided an update to Cummings regarding the potential charges there, along with supporting documentation. The prosecutors informed Cummings that there was no detainer or warrant active for Martinez, nor was there any present intent to prosecute Martinez for the 1985 offense. The prosecutors also clarified that the offense involved was attempted homicide as opposed to a completed homicide.

45. On October 22, 2020, as a result of their concerns with the Court's October 1 Order directing that they issue a subpoena to Sax, the CIU filed in federal court a "motion for clarification" to obtain guidance as to whether Sax, the trial prosecutor, should be considered the CIU's witness or a court witness.

46. Also on October 22, the CIU filed a Notice of Errata and accompanying Corrected Answer to Petition for Writ of Habeas Corpus in federal court, for the sole purpose of correcting a statement in the Answer regarding Sax. The original Answer stated that the May 1989 pre-trial discovery letter sent by the Commonwealth to trial counsel had been prepared by Sax. Although the CIU believed its original statement of that fact was true at the time it made the statement on April 6, 2020, it later discovered that the statement was incorrect. The CIU believed that it was important to correct this error because the Court had in earlier telephone conferences focused on

11

the discovery letter and Sax's involvement in pre-trial discovery.  The CIU therefore corrected

the statement in the Errata and Corrected Answer.

47.     On the morning of October 23, the Court denied the motion for clarification, by

Order and without Opinion.

48.     On the morning of October 23, 2020, Feinberg, Cummings, and Gaeta appeared

via Zoom before Judge Brandeis-Roman.  Judge Brandeis-Roman informed the parties she had

reviewed the case and was prepared to rule on its merits.  The court granted Martinez's petition

and vacated his conviction and sentence.  The court also granted the CIU's motion to *nolle*

*prosse*.

49.     Later that day, Feinberg filed in federal court a joint stipulation of dismissal under

Fed. R. Civ. P. 41(a).  Shortly thereafter, Cummings emailed Judge Goldberg, informing him of

the filing and providing him with the new information regarding the status of the charges in

Puerto Rico.

50.     Mr. Martinez was released from the Pennsylvania Department of Corrections on

October 26, 2020.

51.     On October 26, 2020, Judge Goldberg scheduled a telephone conference for

November 4.

52.     On October 29, 2020, the CIU filed objections to the telephone conference on the

ground that the habeas matter was closed and the Court had no jurisdiction.  The objections also

included the following request for clarification:

> To the extent that the Court may have identified other issues within
> its jurisdiction unrelated to the merits of the case, the
> Commonwealth respectfully requests the Court issue a new order
> identifying those issues.

12

53.     The Court overruled that objection on November 2, 2020, and clarified that the November 4 conference call would focus on issues of the Court's inherent supervisory authority over counsel appearing before the Court.

54.     On November 4, 2020, Judge Goldberg held an on the record telephone conference during which he outlined his concerns about the parties' candor to the Court concerning the state court proceeding.

55.     On December 1, 2020, Judge Goldberg issued the Order to Show Cause that gives rise to this report.