**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTONIO MARTINEZ,** | : | |
| | : | |
| **Petitioner,** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 19-5606** |
| **THERESA DELBALSO, et al.,** | : | |
| | : | |
| **Respondents.** | : | |
| | : | |
| | : | |

**Goldberg, J.**                                                  **February 11, 2021**

**<u>MEMORANDUM OPINION</u>**

Before me are submissions by counsel and *Amici Curiae* (the "Amici") regarding whether the lawyers in this federal habeas matter violated a duty of candor to the court. Several extraordinary occurrences have transpired over the course of this case that provide an important backdrop.[1]

First, the City of Philadelphia's District Attorney's Office (the "District Attorney"), through Patricia Cummings, Supervisor of the Conviction Integrity Unit (the "CIU Supervisor"), has continually and forcefully advocated that convictions for a double homicide, occurring thirty-five years ago, reviewed and affirmed by the Pennsylvania Superior Court, should be vacated.[2] Although a Post Conviction Relief Act ("PCRA") petition was pending in state court, which would normally preclude my involvement, the CIU Supervisor articulated numerous, specific reasons

---

[1]     A more detailed recitation of the facts and procedural history pertinent to this issue are set forth in my December 1, 2020 Order to Show Cause.

[2]     Thomas Gaeta of the Philadelphia District Attorney's Office served as co-counsel for Respondents in this case, but apart from signing onto briefs and other filings, Mr. Gaeta did not advocate during on-the-record hearings.

1

why the District Attorney was waiving state court exhaustion and affirmatively represented that she and Petitioner's counsel had agreed to litigate this matter in federal court.

The reason given for the request that I vacate Petitioner's homicide convictions was disconcerting: a veteran former Assistant District Attorney (the "Trial ADA") or the assigned detectives had knowingly and intentionally withheld substantial evidence pointing to another suspect. Then, according to the CIU Supervisor, the Trial ADA prosecuted a potentially innocent person, obtained a first-degree murder conviction, and stood silent as a life sentence was imposed. Yet, before making these remarkable allegations, the CIU Supervisor made no effort to obtain any type of explanation or information from the Trial ADA or anyone associated with the original prosecution. The CIU Supervisor has also never offered a plausible reason or motive as to why the Trial ADA would engage in such unethical, reprehensible conduct.

The answers to these pressing questions and others were about to be explored through the testimony of the Trial ADA at an evidentiary hearing scheduled before me on November 10, 2020. Although the District Attorney had unilaterally pre-determined that this veteran prosecutor's testimony would not be credible, I viewed, and continue to view, his testimony as indispensable information that any responsible prosecutor and/or judge would want to carefully consider before agreeing to overturn a double homicide state court conviction. Answers to many unasked questions were especially important when the only information before me about the Trial ADA's version of events was a report from the CIU Supervisor, advising that the Trial ADA believed the District Attorney had made several critical misstatements to me. Yet, two weeks before the Trial ADA's testimony was to be heard, and unbeknownst to me, at a hearing in state court, which had

been scheduled and fully prepped, complete relief was granted and Petitioner released.[3]  This takes me to the second extraordinary occurrence in this case.

A careful review of the entire factual record leads to the unmistakable conclusion that the District Attorney, in conjunction with Petitioner's counsel, knowingly sought to simultaneously litigate this case in both state and federal court and failed to advise the federal court that this was occurring.  And this happened after the District Attorney proffered a multitude of reasons why the matter would not proceed in state court.  Despite the CIU Supervisor's subsequent explanation that there were "many situations" in which parallel proceedings of this nature occur, it is clear that the District Attorney misunderstands the importance of the policy considerations concerning federal habeas law and the reasons for state court exhaustion.  Unambiguous United States Supreme Court precedent in habeas matters plainly instructs that parallel litigation of the type that the District Attorney engineered in this case is problematic and disfavored.

The District Attorney's representations regarding its waiver of state court exhaustion and its subsequent inaction when the state court proceedings progressed are central to the candor analysis.  Petitioner's counsel understandably agreed to this waiver as it benefited his client at the time.  Under the unique facts of this case, it certainly would have been preferable had Petitioner's counsel kept the federal court apprised of the progression of the parallel state court proceedings.  That said, I am convinced that Petitioner's counsel understands my concerns, and I conclude that he did not violate his duty of candor to this Court.  Whether the same holds true for the District

---

[3]     On April 22, 2020, I agreed to release Petitioner on bail, pending a full hearing on his habeas petition.  That Order had to be revoked when counsel belatedly informed me that Petitioner was possibly wanted for murder in Puerto Rico.  For several months thereafter, counsel's continued attempts to discern the status of Petitioner's Puerto Rico prosecution were unsuccessful.  On October 21, 2020, two days before the hearing in Petitioner's state court case, where he was released, information from Puerto Rico was apparently finally received, indicating that Puerto Rico now had no "present intent to prosecute" Petitioner.  (Pet'r's Counsel's Br. at 10.)

Attorney is a much closer call. The parallel litigation enabled by the District Attorney sets a troubling precedent that, if continued, could materially alter the procedure in federal habeas cases in the Eastern District of Pennsylvania where the District Attorney is a frequent litigant.

## I.   THE EXHAUSTION REQUIREMENT UNDER 28 U.S.C. § 2254(B)

A federal court may not grant habeas relief unless the petitioner has exhausted his remedies available in state court. 28 U.S.C. § 2254(b); Nara v. Frank, 488 F.3d 187, 197 (3d Cir. 2007). A petitioner "shall not be deemed to have exhausted the remedies available . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

Exhaustion is rooted in comity and reflects the fundamental and important principle that state courts should be given the first opportunity to pass upon and correct alleged violations of the petitioner's constitutional rights. O'Sullivan v. Boerckel, 526 U.S. 838, 839 (1999). "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." Rose v. Lundy, 455 U.S. 509, 518 (1982).

The Supreme Court has been crystal clear regarding the importance of adhering to these principles. In Coleman v. Thompson, 501 U.S. 722, 733 (1991), the Court explained:

> Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

Id. (internal quotation marks omitted) (citations omitted). Exhaustion promotes the important goal of ensuring that state courts develop a complete factual record before claims are presented to

federal courts for review.  Rose, 455 U.S. at 519.  Therefore, as the Supreme Court has stressed, total exhaustion should be "rigorously enforced."  Id.

To satisfy the exhaustion requirement, a petitioner must demonstrate that the claim raised in the federal petition was "fairly presented" to the state courts.  Duncan v. Henry, 513 U.S. 364, 365 (1995).  This obligation cannot be avoided by merely suggesting that a petitioner is unlikely to succeed before the state court, since it is well-established that a claim of "likely futility on the merits does not excuse failure to exhaust a claim in state court."  Parker v. Kelchner, 429 F.3d 58, 63 (3d Cir. 2005).  "Allowing petitioners to bypass state court merely because they believe that their constitutional claims would have failed there on the merits would fly in the face of comity and would deprive state courts of a critical opportunity to examine and refine their constitutional jurisprudence."  Id. at 64.

As was done in this case, a prosecutor may waive the state's right to raise the lack of exhaustion as a defense, but such waiver must be express.  28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.").  By waiving exhaustion and excusing the petitioner from presenting his habeas claim to the state's highest court, the state may lose the opportunity to obtain a merits adjudication of the claim.  See Lambert v. Blackwell, 387 F.3d 210, 238 (3d Cir. 2004); Lockhart v. Johnson, 104 F.3d 54, 57–58 (5th Cir. 1997).

Lastly, but of importance to the candor analysis, I recognize that exhaustion is not a jurisdictional requirement.  Granberry v. Greer, 481 U.S. 129, 131 (1987).

II.   **THE DUTY OF CANDOR UNDER PENNSYLVANIA RULE OF PROFESSIONAL CONDUCT 3.3(A)(1)**

Pennsylvania Rule of Professional Conduct 3.3 provides that "[a] lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  Pa. R. Prof'l Conduct 3.3(a)(1); Artesian Water Co. v. Chester Water Auth., No. 10-7453, 2014 WL 4851498, at *21 (E.D. Pa. Sept. 30, 2014) (stating that counsel's failure to inform the court of his prior misstatement that plaintiff had not received certain documents from defendants that plaintiff had, in fact, already received, "may very well have violated" Rule 3.3); 3G Wireless, Inc. v. Metro PCS Pa. LLC, No. 15-6319, 2016 WL 823222, at *2 n.21 (E.D. Pa. Mar. 2, 2016) (reminding counsel of his duty of candor obligations after counsel continued to rely on facts that were explicitly contradicted by the deposition testimony of his own client).

After reviewing counsel's submissions, I find that neither Petitioner's counsel nor the District Attorney violated Rule 3.3.  While the CIU Supervisor should have notified the federal court that her office no longer endorsed all of the reasons proffered as justifications for waiving the state court exhaustion doctrine, I find that this notification was not required to correct false statements of material fact previously made to me.

III.   **THE DUTY OF CANDOR TO THE COURT CREATED BY THE FUSARI CONCURRENCE**

In Fusari v. Steinberg, the Supreme Court vacated a district court's judgment regarding Connecticut's unemployment compensation procedures based on intervening changes in Connecticut law, which the Court had discovered upon its own independent examination.  419 U.S. 379, 380 (1975).  The majority opinion noted that counsel had failed "fully to inform" the Court of these intervening changes although the parties' briefs had been filed after the new state statute had passed.  Id. at 387 n.12.  In a concurring opinion, Chief Justice Burger expounded on

the duty of candor and laid out important guideposts regarding counsel's conduct and its

continuing duties to the court:

> [A]ll parties failed to inform us that after the District Court had entered judgment
> the Connecticut Legislature significantly changed its unemployment compensation
> system.  I agree with the Court that this failure is 'difficult to understand.'  It is
> disconcerting to this Court to learn of relevant and important developments in a
> case after the entire Court has come to the Bench to hear arguments.  Even at oral
> argument we were not informed of the changes in state law although both parties
> filed their briefs after the new statute was passed. . . . <u>Given the fact that the changes
> in the procedures may well have an effect on 'subsequent proceedings,'</u> the Court
> should have been explicitly advised that changes had occurred.  The only reference
> to changes in the law actually gives the impression that their effect is negligible.
> This Court must rely on counsel to present issues fully and fairly, and <u>counsel have
> a continuing duty to inform the Court of any development which may conceivably
> affect an outcome.</u>

<u>Id.</u> at 390–91 (emphasis added) (citations omitted).

This general duty of candor and good faith "takes its shape from the larger object of

preserving the integrity of the judicial system."  <u>United States v. Shaffer Equip. Co.</u>, 11 F.3d 450,

458 (4th Cir. 1993); <u>Jenkins v. McCoy</u>, 882 F. Supp. 549, 557 (S.D. W. Va. 1995).  Thus, any such

development must be brought to the court's attention "without delay."  <u>See, e.g.</u>, <u>Arizonans for

Official English v. Arizona</u>, 520 U.S. 43, 68 n. 23 (1997) (internal quotation marks omitted) ("It

is the duty of counsel to bring to the federal tribunal's attention, '*without delay*,' facts that may

raise a question of mootness.").   "This is so, even where the new developments, new facts, or

recently announced law may be unfavorable to the interests of the litigant" and even where counsel

has agreed that the matter should proceed to judgment.  <u>In re Universal Minerals, Inc.</u>, 755 F.2d

309, 312–13 (3d Cir. 1985); <u>see also</u> <u>Arizonans for Official English</u>, 520 U.S. at 68 n.23 ("Nor is

a change in circumstances bearing on the vitality of a case a matter opposing counsel may withhold

from a federal court based on counsels' agreement that the case should proceed to judgment and

not be treated as moot."); <u>Walter v. Se. Pa. Transportation Auth.</u>, No. 05-418, 2007 WL 966227,

at *10 (E.D. Pa. Mar. 28, 2007) ("Plaintiff's counsel argue that they did not fail to disclose information to the Court because they independently concluded that the recertification of Ms. Walter was not material to the case.").

The obligation to "ensure that the tribunal is aware of the significant events that may bear directly on the outcome of litigation" is "especially true for government attorneys, who have special responsibilities to both this court and the public at large." Douglas v. Donovan, 704 F.2d 1276, 1279 (D.C. Cir. 1983) (emphasis added); see also United States v. Tucor Int'l, Inc., 35 F. Supp. 2d 1172, 1188 (N.D. Cal. 1998); Brewer v. District of Columbia, 891 F. Supp. 126, 133 n.7 (D.D.C. 2012).

Given the Fusari standard, which dictates that attorneys have a continuing duty to inform the court of any developments which may conceivably affect the outcome of the litigation, it would not be difficult to conclude that the federal court should have been advised that substantial changes had occurred regarding state court exhaustion and the District Attorney's waiver. This is especially true given the heightened standard of candor expected from a prosecutor.

Since Fusari, rather than requiring counsel to advise the court of developments that may "conceivably" affect the outcome of a case, some courts seem to have narrowed the duty of candor to require an element of materiality. Those courts have invoked the duty when counsel has failed to inform the court (or belatedly informed the court) of a development that could have a **material** effect on the outcome of the litigation. See, e.g., Bd. of License Comm'r of Town of Tiverton v. Pastore, 469 U.S. 238, 240 (1985); United States v. Shaffer Equip. Co., 11 F.3d 450, 458–59 (4th Cir. 1993). Inclusion of this materiality element appears to be the main focus and concern of the Amici's submission.

For example, most often, courts have narrowed the application of the duty of candor created by the Fusari concurrence to developments that "could have the effect of depriving the court of jurisdiction due to the absence of a continuing case or controversy."  See Pastore, 469 U.S. at 240 (granting certiorari to decide whether the Fourth Amendment exclusionary rule applied in civil liquor license revocation hearings and holding that the case was moot because the liquor-serving establishment that had been searched had gone out of business).[4]

The Honorable Jan E. DuBois, a member of this Court, authored an opinion on the issue. In Walter v. Southeastern Pennsylvania Transportation Authority, the plaintiff, an individual with impaired mobility, sued Southeastern Pennsylvania Transportation Authority ("SEPTA"), for violating the paratransit provision of the Americans with Disabilities Act ("ADA").  2007 WL 966227, at *1.  "Unbeknownst to the Court, in January 2006, while defendant's Motion to Dismiss was pending, [the plaintiff]'s paratransit eligibility was recertified by defendant SEPTA.  Under

---

[4] See also Arizonans for Official English, 520 U.S. at 68 n.23 (involving a state employee action against the state, the governor, the Attorney General, a state senator, and the state's department of administration regarding enforcement of a state constitutional amendment making English the state's official language and holding that the case was moot because the employee had resigned); In re Universal Minerals, Inc., 755 F.2d at 312–13 (dismissing an appeal because counsel failed to address the jurisdictional defect which formed the basis of the district court's ruling and then never responded when counsel was asked to submit a supplemental letter to this effect); Douglas, 704 F.2d at 1279 ("The Department of Labor [("DOL")] . . . seeks to overturn an order of the district court that enjoined its Office of Workers' Compensation Programs from honoring a writ of garnishment against disability benefits paid to the appellee . . . . Since the date of that order, however, [appellee] and his former wife have settled the alimony and child support dispute underlying the present lawsuit.  Thus, the case has become moot. . . . Despite the preemptive effect that the settlement agreement has had on the present litigation, counsel for neither [appellee] nor the DOL properly informed this court of its existence."); Martinez v. Barasch, No. 01-2289, 2004 WL 1555191, at *4 (S.D.N.Y. July 12, 2004) (finding that the plaintiffs neglected to inform the court that they were no longer members of the Allied Welfare Fund and, therefore, lacked standing to bring the action); Tucor Int'l, Inc., 35 F. Supp. 2d at 1188 (granting a motion to dismiss a criminal action because an exemption under the Shipping Act of 1984 applied to the conduct alleged in the indictment, which "the government, by its silence in the plea proceedings, prevented . . . from being resolved prior to the Court's acceptance of the plea and imposition of sanctions").

her recertification, [the plaintiff] was determined to be eligible for paratransit service." Id. at *2. Approximately 7 months after counsel became aware of the plaintiff's recertification, Judge DuBois was informed of this important development during a telephone conference.  Id. at *3. Plaintiff's counsel admitted that they were aware of the recertification but "elected not to inform the Court . . . because of their belief that it did not materially affect this litigation." Id. (internal quotation marks omitted).  Judge DuBois understandably disagreed.

While Judge DuBois ultimately determined that the recertification did not moot the action, he, nonetheless, considered whether the plaintiff's counsel had breached its duty of candor under Fusari and the United States Court of Appeals for the Third Circuit's decision in In re Universal Minerals, 755 F.2d 309.  Id. at *10 (citing the Fusari concurrence and counsel's continuing duty to inform the court of any development which may conceivably affect an outcome of the litigation). Judge DuBois reasoned that counsel was not relieved of their obligation to advise the court of the recertification merely because the court had not yet decided whether the action was moot:

> Plaintiff's counsel argue that they did not fail to disclose information to the Court because they independently concluded that the recertification of Ms. Walter was not material to the case.  Plaintiff's counsel states that if the case was not rendered moot as a result of the action of SEPTA, then counsel surely had no obligation to advise the Court that the defendant had an invalid defense to present.  The Court disagrees.  This statement does not comport with counsel's duty of candor as stated by the Third Circuit.  Although the Court has ultimately concluded that plaintiff's claim is not moot, it is clear that the recertification was a development that could have conceivably affected the outcome of the litigation and should have been disclosed by plaintiff's counsel.

Id. (internal quotation marks omitted); see also Calleros v. FSI Intern, Inc., 892 F. Supp. 2d 1163, 1167–68 (D. Minn. 2012) ("Tellingly absent from [the plaintiff]'s Motion papers is *any* reference to the state-court cases raising nearly identical issues to the instant action. . . . The Court is troubled by the failure to mention the related state-court litigation. . . . It seems fairly apparent that counsel have flouted [their duty of candor] obligation here." (internal quotation marks omitted)); Hartsell

v. Source Media, No. 98-1980, 2003 WL 21245989, at *1 (N.D. Tex. Mar. 31, 2003) ("The Court believes that [class counsel] had a duty to advise the Court promptly of the facts relating to [the convicted class representative] once they came to her attention. . . . Only in this way could [class counsel] satisfy her fiduciary duty to the class and her duty of candor to the Court, so that the Court could satisfy its responsibilities to act as guardian of the class's interests.").

Judge Dubois's reasoning in Walter is highly instructive regarding the case before me. Walter was a civil matter in which the development not disclosed (paratransit eligibility) was ultimately found not to have affected the outcome of the litigation. This is similar to the rationale raised by counsel here and the Amici. (Amici Br. at 16 ("Amici are unable to discern any development that was material to this Court's adjudicative process until the state court granted relief.").) Yet, Judge Dubois still rightfully expected that counsel should have advised him of this development, even though it never affected the outcome of the case before him.

In Brewer v. District of Columbia, the plaintiff, a teacher who worked for the District of Columbia Public Schools, sued the District of Columbia for age discrimination. 891 F. Supp. 2d at 129. The District of Columbia moved to dismiss the plaintiff's claims, asserting that the claims were barred, in part, by res judicata, collateral estoppel, and "parallel litigation." Id. The District of Columbia argued that the plaintiff had filed an action in the Superior Court of the District of Columbia, alleging claims arising out of the same set of facts as the federal complaint. Id. at 133. However, after the District of Columbia's motion to dismiss was filed, the plaintiff voluntarily dismissed the Superior Court case without prejudice. Id. Although the District of Columbia based "certain arguments in [its] motion on the existence of the Superior Court case, [it] failed to inform [the] court that that case ha[d] since been dismissed." Id. at 133 n.7. Based on its lack of candor, the court found that the District of Columbia had "failed in [its]

'duty to inform the [c]ourt of any development which may conceivably affect the outcome' of litigation." Id. (quoting Fusari, 419 U.S. at 390–91).  The court found the District of Columbia's failure to be "particularly significant" because "'government attorneys [] have special responsibilities' to ensure that the court is aware of 'significant events that may bear directly on the outcome of the litigation.'"  Id. (emphasis added) (quoting Douglas, 704 F.2d at 1279).

Although many courts have recognized (and discussed at length) the importance of the Fusari duty of candor, most have been reluctant to impose sanctions.[5]

## IV.   ARGUMENTS RAISED BY COUNSEL AND THE AMICI

The submissions of counsel, the Amici, and the declaration of Professor Stephen Gillers each identify several reasons why counsel did not violate their duty of candor.  These reasons all seemingly center on the issue of materiality and urge that while more candor was probably

---

[5] See supra Footnote 1; Walter, 2007 WL 966227, at *10 ("The Court admonishes plaintiff's counsel to avoid such conduct in the future, but concludes that no sanctions or other action by the Court is required."); C&C/Manhattan v. Gov't of Virgin Islands, No. 1999/038, 2000 WL 1673356, at*1 (D.V.I. Sept. 29, 2000) ("The Court . . . takes this opportunity to admonish counsel on their failure to disclose pertinent facts, and warn that such conduct will not be tolerated in the future.  First, counsel failed to disclose that during the pendency of this appeal, the Territorial Court dismissed this action with prejudice when it ruled that C&C/Manhattan had no standing to bring suit as an unsuccessful bidder.  Second, counsel failed to disclose that the construction of the prison was proceeding to completion during the pendency of the appeal."); Solze v. Shinseki, 26 Vet. App. 299, 303 (Vet. App. 2013) ("To be absolutely clear, the parties in this case were under a duty to timely notify the Court of the Board's January 24, 2013, decision, and both parties breached that duty.  To the extent that this duty has not previously been made clear by the Court, neither sanctions nor referral for disciplinary action are warranted in this case.  However, counsel in this case—and all parties to every case before the Court—are now on notice of their continuing responsibility to apprise the Court of significant developments, particularly for cases filed pursuant to Rule 21."); Senior Settlements, LLC v. Growth Trust Fund, No. 05-0777, 2005 WL 2789380, at *1 (D.N.J. Oct. 26, 2005) ("Defendants' written submission omitted any reference to the forum selection clause contained in the Agreements. . . . The Court hereby admonishes counsel to avoid such conduct in the future.")

appropriate, the events occurring in state court were not significant enough to warrant sanctions. I will attempt to address each of these arguments below.

First, in varying degrees, each submission takes great care to remind me that counsel's work in this particular case was of significant magnitude.  (E.g., Amici Br. at 2 (explaining that counsel were "repairing a miscarriage of justice").)  I certainly agree with this sentiment—counsel's lawyering in this case was of the upmost importance and, in fact, persuaded me to take the extraordinary step of releasing Petitioner on bail before a full hearing could be held and before any explanation could be provided by the Trial ADA.  (See April 22, 2020 Order, ECF No. 21.) But even matters of great importance do not absolve counsel of their duty to be candid with the court.  Cf. Jenkins v. McCoy, 882 F. Supp. 549, 557–58 (S.D. W. Va. 1995) ("[The duty of candor] sometimes comes into conflict with a lawyer's duty of zealous representation and confidentiality to his client.  Nonetheless, even when such a conflict arises, it is the duty of candor and honesty which must prevail.").  And it could certainly be argued that matters of significant importance, such as asking a federal judge to overturn a state court first-degree murder conviction, require more, not less candor.

Second, all submissions go to great length to assert that neither counsel understood that the October 23, 2020 proceeding before the state court would address the merits of Petitioner's PCRA petition and result in his release.  They argue that because the result in state court on October 23 was unknown, the events leading up to this proceeding were not material developments and thus no disclosure to the federal court was required.

For example, citing Professor Gillers's declaration, Petitioner's counsel states that he could not have known if and how the state court judge would rule on October 23, 2020.  (Pet'r's Counsel's Br. at 14–15.)  The CIU Supervisor goes further, asserting that not only did she not

know what would occur on October 23, but she <u>should not</u> have known that the state court <u>was even prepared to hear the merits</u> of Petitioner's case.  (D.A.'s Br. at 24 ("[W]e did not know (nor should have known) that the court would review the merits of the petition . . . .").)  The District Attorney repeats this statement several times throughout its brief, pressing that only at the October 23 hearing did it "first learn that the state court judge was acquainted with the record."  (<u>Id.</u> at 16, 24, 31, 27.)  The Amici join these arguments, stating that counsel did not know that "the state court would entertain let alone grant the parties joint application for relief."  (Amici Br. at 1.)

A careful review of the entire record, including the state court October 23 transcript, belies the notion that counsel were in the dark about what would occur on that date and thus had no reason to consider, prior to October 23, whether such a hearing was a material occurrence requiring their disclosure in candor to the federal court.

In fact, a flurry of litigation activity occurred in state court <u>before</u> the October 23 hearing, establishing, at the very least, that counsel was aware that the state court judge had become very familiar with the matter before the hearing.  This activity included phone calls with the state court judge, one of which was arranged via email by the CIU Supervisor, so she, Petitioner's counsel, and the state court judge could all "discuss this matter . . . before the upcoming listing."  (Ex. Z to D.A's. Br.; <u>see also</u> Ex. Y to D.A.'s Br.)  According to Petitioner's counsel, he and the CIU Supervisor had a call with the state court judge on October 15, 2020, during which counsel requested that Petitioner's case be heard on the merits and the state court judge informed counsel that she would review any submissions before October 23, 2020.[6]  (Pet'r's Counsel's Br. at 9.)

---

[6]     This statement appears to be at odds with Professor Gillers's declaration, which opines that "counsel could not have *known* (1) the degree to which the assigned judge had become acquainted with the record . . . ."  (Gillers's Decl., ECF No. 54-1, at ¶ 18(3).).  As noted above, the state court judge told Petitioner's counsel that she would review any submissions before October 23.

Extensive briefs, which greatly detailed the basis of the alleged <u>Brady v. Maryland</u>, 37 U.S. 83 (1963), violations, were also filed with the state court judge prior to October 23.  (<u>See</u> Ex. A to Amici Br. at 9.)  In light of this activity, it is disingenuous for the CIU Supervisor to continue to insist that she did not know, "nor should have known," in advance of October 23 that the state court judge had "become acquainted with the case."  (D.A.'s Br. at 24, 27.)

The transcript from the October 23, 2020 hearing also sheds considerable light on whether counsel may have had knowledge about what would occur at this hearing.  Petitioner's counsel, apparently through cooperation with the court, had made arrangements for Petitioner's family to be present for the video hearing.  (Hearing Tr., 10/23/20, 4:19–5:12.)  Several of the victims' family members were also present on video, apparently invited by the District Attorney, who expressed gratitude that those family members were present "to witness the events <u>that we anticipate may occur today</u>."  (<u>Id.</u> at 7:7–14 (emphasis added).)  In my experience, arranging for members of both a defendant and victims' family to be present is hardly consistent with a status conference or other preliminary proceeding where a judge is unfamiliar with a matter or where the merits of a case will not be addressed.

Each attorney also acknowledged that extensive material had previously been submitted to the state court judge.  (<u>Id.</u> 5:10–7:14 ("We have given the court quite a lot of briefing in this case.").)  Indeed, the CIU Supervisor not only recognized that "everything ha[d] been extensively briefed," but also expressed her appreciation to the court for its preparation: "we are very grateful to the Court <u>to know that the Court has reviewed that briefing</u>."  (<u>Compare</u> <u>id.</u> at 7:3–5 (emphasis added), <u>with</u> D.A.'s Br. at 24 ("[W]e did not know (nor should we have known) that the Court would review the merits of the petition . . . .").)  After extensive remarks regarding the <u>Brady</u>

violations and offering an apology to the "citizens of the City of Philadelphia," the CIU Supervisor again noted that she "anticipated" that the petition would be granted.  (Id. at 10:7–11:1.)

Of course, no lawyer can ever predict with one-hundred-percent certainty exactly what a judge will do at any proceeding.  But the events leading up to the October 23 hearing and a fair and candid reading of the transcript of that hearing simply do not support the proposition that counsel were unaware of what would occur on that date—such that no duty was owed to the federal court beforehand.  This is especially true where there was complete agreement between counsel that PCRA relief should be granted.  This knowledge certainly heightened counsel's obligations, especially those of the District Attorney, to consider and advise the federal court of parallel efforts to resolve Petitioner's post-conviction claim.

But whatever counsel and the state court knew or did not know before October 23, 2020 does not diminish the importance of the District Attorney's affirmative waiver of state court exhaustion made in federal court and the policy reasons behind the exhaustion doctrine.  Although not a jurisdictional requirement, exhaustion is an important threshold issue and a gateway to the federal court's consideration of a habeas petition.  Thus, a prosecutor's power to waive exhaustion, which disrupts the required deference to state courts, is an extraordinary grant of discretion and should be exercised with caution.  Importantly, the exercise of this discretion cannot be used as a mechanism to forum shop for the quickest result without full disclosure to the federal court. Having waived exhaustion and having provided specific reasons for doing, that were based upon the extraordinary needs of this particular case, candor required that the CIU Supervisor notify the federal court at once if and when, in her view, those extraordinary needs no longer existed.

In light of these important principles, I am concerned by the District Attorney's insistence that, after waiving state court exhaustion, it may conduct parallel proceedings in state court without

informing the federal judge.  And I flatly reject the District Attorney's argument that this highly unusual process was justified because counsel could not fully predict what the ultimate outcome would be in state court.  This argument is contradicted by the record and is directly contrary to the principle of comity memorialized in 28 U.S.C. § 2254's exhaustion requirement and upheld by the Supreme Court.

In an effort to provide the CIU Supervisor with every benefit of the doubt, I gave her an opportunity to explain her conduct.  Unfortunately, the Supervisor of the District Attorney's Conviction Integrity Unit believes that what occurred in this case was perfectly acceptable.  The CIU Supervisor stated that she "absolutely believed" that she had no obligation to inform me of the state proceeding because "[i]t has been [her] experience so far that federal writs of habeas corpus along with state court PC[R]A actions in the State of Pennsylvania are parallel court proceedings."  (Am. Tr., 11/4/2020, at 38:6–9.)  She added: "I am aware of many situations where you can have cases going forward on that parallel track and what I had seen in my experience since I've been here in Philadelphia is sometimes what you do is you say that I don't want them both going forward at the same time.  So you might say, I want to request a stay in one such that you could litigate the other."  (Id. at 38:9–15.)[7]  Ironically, a stay was never sought by the District Attorney in federal court.

---

[7]      I question, but will not explore further, whether this statement of law by the District Attorney violates Rule 3.3(a)(1).  It is true that habeas proceedings involving a petitioner could, in some instances, conceivably proceed concurrently with a state court proceeding brought by the same petitioner but only in the context of mixed habeas corpus petitions, i.e., habeas petitions that contain both exhausted and unexhausted claims.  But this only occurs when the federal court is fully aware that a parallel state court proceeding exists.  If, in its discretion, the district court allows the federal proceeding to move forward, it would be on the already exhausted habeas claims, while the state court hears the unexhausted claims.  See, e.g., Crews v. Horn, 360 F.3d 146, 154 (3d Cir. 2004).  In any event, this case is much different in that it involved parallel proceedings of only unexhausted claims.

These statements reveal the poorly informed thought process that led us to where we are today in this case.  The District Attorney continues to insist that because it maintains waiver discretion, it may pick and choose where post-conviction constitutional claims are heard, and parallel litigation may occur without triggering the duty of candor obligation until the state court matter is terminated.  Allowing this process would permit the District Attorney to use its waiver power to override and otherwise flout the important principles of comity, candor to the tribunal, and efficient use of judicial resources at play here.  It is especially important to raise these concerns with the District Attorney, a very active habeas litigant in federal court.

A third reason offered by Petitioner's counsel, the District Attorney, and the Amici as to why counsel had no duty to inform me of the reactivation of the state court proceedings focuses on the fact that counsel's involvement in those proceedings was short-lived.  Petitioner's counsel notes that he was "actively involved in [the state court] proceedings for a period of only ten days . . . between the entry of [counsel's] appearance in state court on October 14, 2020 and the conference before Judge Brandeis-Roman on the morning of October 23, 2020."  (Pet'r's Counsel's Br. at 1, 11.)  The District Attorney suggests that the relevant period regarding its duty of candor obligation was sixteen days "from October 8 to 23."  (D.A.'s Br. at 3.)  The District Attorney explains that "[b]efore then, [it] was not even aware that the state court had scheduled a conference for October 23."  (Id.)  The Amici echo this contention: "it surely matters here that only fifteen days elapsed between when the lawyers learned of the facts pertaining to the CIU's stated reasons for waiving its exhaustion defense and when the Court was informed of the state court action."  (Amici Br. at 9–10.)

As an initial matter (and setting aside the fact that two weeks is not a short amount of time), I conclude that the question of how long counsel was involved in the state court proceeding

misdirects the focus of whether counsel breached the duty of candor.  Courts have made clear that counsel must inform the court of a material development without delay.  See, e.g., Arizonans for Official English, 520 U.S. at 68 n.23.

After careful consideration of the entire record, I disagree that counsel were not involved in the state court litigation or aware that it had progressed until early October 2020.  This conclusion is supported by the following occurrences:

- As Petitioner's counsel states, he was "engaged to represent Mr. Martinez in April 2019." (Pet'r's Counsel's Br. at 2.)  At this time, a PCRA petition had already been filed, commencing state court litigation.  (Id. at 3.)

- According to Petitioner's counsel, after being engaged by Petitioner to represent him regarding the post-conviction Brady issue, "[Petitioner's counsel] began to consider procedural options for relief for Mr. Martinez in state or federal court."  (Id. at 3 (emphasis added).)

- Petitioner's counsel discussed his initial evaluation of Petitioner's case with the CIU Supervisor as early as April 2019.  (Id.)  During the course of those conversations, "all counsel were aware that Mr. Martinez had, with the assistance of another prisoner, initiated pro se litigation in state court, by filing on March 26, 2019, an amendment to a previously filed pro se [PCRA] petition" in state court.  (Id. (emphasis added).)

- On May 7, 2019, counsel "executed a discovery and cooperation agreement whereby the CIU agreed to disclose all relevant documents from the District Attorney's Office file and the police homicide file."  (Id. at 4.)  As represented by Petitioner's counsel, "[d]uring the next five months, the CIU disclosed to [Petitioner's counsel] more than 3,400 pages of documents from those files."  (Id.)

- The "state court initially sought sua sponte to dismiss Mr. Martinez's state petition in July 2020," and "the parties sought to preserve the state petition."  (District Attorney's Br. at 3 n.4.)  In fact, the CIU Supervisor directly communicated with the state court judge on this issue on July 23, 2020.  (Ex. Y to District Attorney's Br.)

- The state court judge originally scheduled a conference on Petitioner's PCRA petition for September 25, 2020.  (Ex. A. to Amici Br. at 2.)  That conference was continued.  (Id.)  On that same day, the docket reflects an entry, stating "Defense Request For Continuance For Attorney To Be Appointed."  (Id. at 8.)

- On October 12, 2020, the CIU Supervisor emailed the state court judge regarding that appointment and requested a call between herself, Petitioner's counsel, and the state court

judge to discuss the case before the October 23, 2020 hearing.  (Ex. Z to District Attorney's Br.)

Based on these facts, I cannot accept counsel's arguments that they had no duty to inform me of the state court proceedings because their involvement in those proceedings was so brief. Over the course of approximately a year and half, and after a PCRA petition had been filed in state court, counsel were both engaged in substantial discussions regarding relief for Petitioner, thousands of pages of documents were exchanged, state court Orders were issued, and status conferences in state court were scheduled.  The fact that Petitioner's counsel did not officially enter his appearance in the state court proceeding until October 14, 2020 is of no moment.  The record reflects that counsel was involved in a variety of important activities on Petitioner's behalf, starting in April 2019 and continuing until he entered his appearance in state court in mid-October 2020.  And, as evidenced by the CIU Supervisor's July 23, 2020 communications with the state court judge, the District Attorney was also aware that the state court proceeding had begun to progress before October 8, 2020.

In short, a fair reading of the record reflects that state court litigation, which commenced at least as far back as March 26, 2019, began proceeding simultaneously with the federal court habeas case, and triggered counsel's duty of candor obligation, in July 2020, when the state court began issuing Orders and the CIU Supervisor contacted the state court judge seeking to avoid dismissal of the PCRA petition.

## V.    CONCLUSIONS

Having carefully considered this matter, I reach the following conclusions:

- I agree with counsel and the Amici that the issue of materiality should be considered when determining whether a duty of candor has been violated.  The <u>Fusari</u> Court's concurrence, which suggests that candor is required when an event arises that "may conceivably affect

20

an outcome of litigation," is too broad a standard and places too heavy a burden on litigation counsel.

- Failure to disclose facts pertaining to exhaustion that would ordinarily be the basis of a summary dismissal of a federal habeas matter are by their nature "material" to the disposition of the case. But most candor to the court cases, in which sanctions have been issued, involved lapses pertaining to jurisdiction. Although possible mootness of the federal matter was certainly implicated here, I was not completely deprived of jurisdiction until the state court issued its decision on the PCRA petition.

- I disagree with the Amici that the facts of this case are similar to instances in which, during the course of litigation, the direction of that litigation changes. (Amici Br. at 23–24.) I am keenly aware that litigation can change course quickly, sometimes on the eve of trial or just prior to the issuance of an extensive written ruling by the court. And my concerns here have nothing to do with the substantial work and judicial resources expended in this matter, which included the time period <u>both</u> before and after Petitioner's counsel entered his appearance in state court. This is the work that judges do—and the resolution of cases often occurs without the court's involvement, rendering a judge's final word moot. But what occurred here is not, as the Amici suggest, analogous to a civil or criminal matter that morphed from a trial to a settlement or plea agreement. Nor is it a lapse of "courtesy" on the part of the District Attorney. In the matter before me, lawyers from a very public office, held to the highest standard of candor to the court, either knowingly or through a lack of understanding of basic federal habeas principles, engaged in the clearly discouraged process of parallel state and federal post-conviction litigation and did so without advising the federal court that this was occurring. Last minute settlements, pleas, and amended

pleadings are allowable by the law and are sometimes even encouraged.  But ongoing, simultaneous state PCRA proceedings, in the midst of federal habeas litigation, is strongly disfavored.

- Given the undeniable importance of state court exhaustion in habeas matters, and after affirmatively advising that it sought to litigate the claims raised in Petitioner's PCRA petition in federal, not state court, the District Attorney should have advised me well before October 23 that it was fully engaged in parallel state court litigation.

- Because Petitioner's counsel did not and could not present the original waiver to this Court, and counsel did not have the same heightened candor obligations as the District Attorney, no further action by me is required as it relates to Petitioner's counsel.

I issued the Rule to Show Cause and this Opinion after a considerable amount of thought, keeping in mind that the District Attorney's representative is a supervisor in that Office and that Petitioner's counsel has appeared before me previously and provided exemplary, ethical lawyering at every turn.  I have also carefully considered the views of the Amici, all respected members of the bar.  I regret the need to issue this Opinion but cannot turn a blind eye to the conduct undertaken here by the District Attorney.

While I will not impose sanctions, an admonishment of the District Attorney, as set forth in this Opinion, is appropriate.  Going forward, in habeas matters assigned to my docket in which the District Attorney chooses to affirmatively waive state court exhaustion, status reports will be required regarding any state court litigation.  I typically do not impose requirements of this nature on counsel, but such oversight of the District Attorney is now unfortunately warranted.

I have no binding authority over the judges in this district to direct that they adopt similar procedures in habeas matters involving the District Attorney.  But this Opinion will be shared with

my colleagues, so that they are at least aware of the unusual process implemented by the District Attorney in this case.